BUTTE & BOSTON CONSOL. MINING CO., Appellant, *v.* MONTANA ORE PURCHASING CO. ET AL., Respondents.

(No. 1,459.)

(Submitted June 28, 1900. Decided February 11, 1901.)

*Mines and Mining — Co-Tenants — Statutes — Constitutional Law—Vested Rights—Amendments—Construction—Interpretation—Retrospective Operation—Injunction.*

1.   The Act of February 8, 1865, Section 1 (Bannock Statutes, p. 454), de-
     stroyed the right of survivorship in joint tenancies ; it, however, was not
     retrospective in its operation, but affected subsequently accruing rights
     only, since the legislature had no power to interfere with existing rights
     by converting joint tenancies into tenancies in common.

2.   The Act of February 8, 1865, Section 2 (Bannock Statutes, p. 454), de-
     stroyed those characteristics of tenancies in common wherein they mainly
     differ from holdings in severalty, leaving the necessity for voluntary or
     judicial partition as the chief remnant of the distinguishing feature of this
     species of ownership ; but it was not retrospective in its operation.

3.   For one co-tenant, without the consent of the other, to mine and remove
     ore from the common property, is an unauthorized taking away and lessen-
     ing in value of the property within the meaning of the Act of 1865 (Ban-
     nock Statutes, p. 454). .

4.   The provisos of "House Bill No. 1" of the Laws of 1899 (p. 134) apply to
     co-tenants whose estates were in existence when the law was passed, and,
     as to such estates, it is an attempt to disturb or destroy vested rights and,
     therefore, is inoperative and void as to them, being repugnant to Sections
     3 and 27 of Article III of the Constitution of Montana, and also Amend-
     ment XIV of the Federal Constitution.

5.   Any co-tenant whose estate was created after the Act of 1865 took effect,
     and before the amendment of 1899 became operative, is entitled to restrain
     by injunction such mining and removal of ore from the common property
     by his co-tenant, as is prohibited by the statute of 1865 and Section 592 of
     the Code of Civil Procedure, provided that the remedy at law is inadequate
     and the threatened injury irreparable.

6.   When one state adopts a statute from another state, after a judicial in-
     terpretation thereof by the courts of the parent state applicable to the
     conditions of the adopting state, the legislature will be presumed to have
     adopted the interpretation with the statute.

7.   The preventive force of an act of the legislature, as well as its positive
     effect, is to be determined by the judiciary ; the law-making power cannot
     determine the past legal force and effect of any statute.

ON RE-HEARING. REVERSED.

For former opinion, see 24 Mont. 125.

*Messrs. Forbis & Evans, Mr. Ransom Cooper, Mr. William H. DeWitt, Mr. William Scallon* and *Mr. T. J. Walsh,* for Appellant.

*Messrs. McHatton & Cotter, Messrs. Clayberg, Corbett & Lee, Mr. Robert B. Smith, Mr. Charles R. Leonard, Messrs. McConnell & McConnell* and *Messrs. Toole, Bach & Toole,* for Respondents.

The evidence established that the defendants F. Augustus Heinze and Arthur P. Heinze had long prior to the commencement of this action entered into the actual occupancy of por-

tions of the Tramway and Snohomish lode claims, which were not at the time in the occupancy of the plaintiff, or any one else, and that they had run drifts and made underground workings at much expense for the purpose of extracting ore from said claims, and were engaged in extracting ores therefrom in their right as co-tenants thereof, under the provisions of the law of Montana designated as House Bill No. 1. That at the time they entered into the occupancy of said portions of said claims, no objection was made thereto by the plaintiff, and that it made no objection to their carrying on the mining operations therein until the commencement of this action. That they kept accounts of the amount and assay value of all ores extracted by them from said claims. That they were and are solvent and at all times were ready and able to account to their co-tenants for the net profits of said mining operations, and that under the provisions of said law they had a right to the exclusive possession of all those portions of said mining claims of which they were in the actual occupancy at the time this action was commenced and had a right to continue in the exclusive occupancy thereof and to mine and extract the ores from said claims, subject only to an accounting to their co-tenants for any net profits derived from said mining operation.

Where one co-tenant has not joined with his other co-tenants at the time they enter into the actual occupancy of a mining claim or a portion thereof, and engage in doing work for the purpose of mining the claim or extracting ore therefrom, he is not under said law entitled to be threafter let into the occupancy and possession thereof with them. They are entitled to maintain their occupancy of such portion to his exclusion and he has a right, if he so desires, to enter upon any portion of the common property not then in the actual occupancy of his co-tenants and to continue therein and mine the same to their exclusion, each being accountable to the other only for the net proceeds of the mining operations conducted by him. As to such portion he has the same right as if it belonged solely to him, subject only to the condition that he shall account to his

co-tenant or co-tenants for the net profits which he may realize from his mining operations. He is entitled to retain the exclusive control and occupancy of such portion. The only way in which he can be deprived of this occupancy and his right to mine is by partition and sale of the mining claim. The law provides a plain and adequate remedy for a non-joining co-tenant against his working co-tenant or co-tenants. He is entitled to an accounting for the net profits of the mining operations. An injunction will not issue where a party has a plain and adequate remedy at law. It cannot under said law be issued at the suit of one co-tenant against the other.

The refusal to grant the injunction was within the discretion of the district court and the order will not be reversed on appeal. The appellant seems to rely upon Section 592 of the Code of Civil Procedure as construed by this Court in *Anaconda Copper Mining Co.* v. *Butte & Boston Mining Co.,* 17 Mont. 518, and upon that decision, overlooking entirely the fact that said section was repealed by House Bill No. 1 and that the same and the decision of this Court referred to did not, after the adoption of said House Bill, have any effect whatever and are not pertinent of consideration further than that they may be looked to in a consideration of the legislative intent expressed in House Bill No. 1. It is proper to consider said section and the decision referred to for the purpose of construing the present law, and to ascertain the wrong which it was passed to remedy. It has no other importance in this case. It should receive a construction broad enough to remedy the wrong intended to be corrected.

Under Section 592 of the Code of Civil Procedure, one co-tenant without the consent of the other co-tenants could not carry on any mining operations in the common property or do any work thereon. This was found to be a hardship and injustice to co-tenants desiring to develop or mine the common property. A co-tenant owning a small interest in a mine or mining claim and wishing to control the same absolutely had but to refuse to join with his co-tenants in doing work thereon,

or to withhold his consent to their doing work and mining in the claim. It was the wish of the people of the state to change this condition and that the industry of mining should be encouraged rather than retarded, so the legislative assembly in the exercise of its wisdom enacted House Bill No. 1 to the end that each co-tenant might have the use and benefit of his interest in the common property regardless of the wish or consent of his other co-tenants. The act in question is entirely inconsistent in its provisions with Section 592, Code of Civil Procedure, and in so far as mining property is concerned it entirely repeals it. The authorities are all to the effect that where an amendment contains language covering the entire subject of the statute amended, and is inconsistent with it, the original statute is repealed by the amendment. (*Billings* v. *Harvey,* 6 Cal. 381; *Billings* v. *Hall,* 7 Cal. 1; *Clark* v. *Huber,* 25 Cal. 596; *Bensley* v. *Ellis,* 39 Cal. 313; English on Interpretation of Statutes, Secs. 195-196, and cases cited in Note.) The rights of the parties hereto are then dependent upon and governed by the provisions of House Bill No. 1 alone, and that is the only statute for consideration or construction. In construing a statute the court may inquire what was the object the legislative assembly sought. (*Perkins* v. *Guy,* 2 Mont. 15 and 20.)

The mining industry in this state is to be encouraged within legal lines and limitations. It is and has been the policy of the government of the United States to encourage the development and working of mining ground. The cardinal principle in permitting private ownership of mineral lands is that the owner may be encouraged to the extraction of valuable ores therefrom. Generally mining claims are not to be considered valuable aside from the value which they have for the ores which may be contained within them. Their ownership gives the right to develop them and to extract the valuable ores therein contained. It is not true that a mining claim should be worked of itself. The history of mining has demonstrated that the most economical results are obtained by mining claims in connection

with others, and through and by means of openings already made. So far as the entry and mining by one co-tenant upon the common property, under the provisions of House Bill No. 1, are concerned, it requires no argument to show that he has the same rights as if he were the sole owner of the claim. The policy of the law and its purpose was to permit a co-tenant to extract ores from the common mining property. Any work that is done in a mining claim in the conduct of actual mining operations for the purpose of extracting ore and which in itself is done in a miner-like manner tends to develop the property. At common law one co-tenant of a mining claim had the right to enter upon the common property and mine, mill and dispose of the ore. This is thoroughly well settled in California, and the doctrine has been approved by this Court. (*McCord* v. *Oakland Q. M. Co.*, 64 Cal. 134; *Anaconda Copper Mining Co.* v. *Butte & Boston Mining Co.*, 17 Mont. 519.)

The law under consideration gives one co-tenant the right to enter on the common property at any point or points not then in the actual occupancy of the non-joining co-tenants, and to occupy the same and carry on mining therein, and to mill and dispose of the ore. Of course there is an obligation which arises from the exercise of the right, and that is that he shall account to the non-joining co-tenant or co-tenants for the net profits of mining operations, if any made. This we say is an obligation but is not a limitation. If the obligation is not discharged a non-joining co-tenant has his action for an accounting.

The Court in construing a statute will give its provisions a reasonable construction with a view to carrying out its objects and giving effect to its general intent. Where there is any doubt, obscurity or ambiguity in a statute, the general intent should control. As we have said, the general intent of this statute is to allow co-tenants to occupy and mine the common property regardless of the wish of their co-tenants. Courts construe statutes by considering the subject matter of the act, its object and intent and giving effect to the general intent

wherever it can be done.   Statutes should be so construed as
to uphold them and to give effect to their general purpose.
This Court has held that co-tenants in mining property are not
co-partners.   (*Harris* v. *Lloyd,* 11 Mont. 390.)

## REPLY BRIEF OF RESPONDENTS.

In considering the question of the constitutionality of House
Bill No. 1, we desire first to present to this Court our views
of the decision in the case of the Anaconda Company against
the Butte & Boston Company, in 17 Montana, page 519.    In
the Anaconda Company case the plaintiff was the owner of an
undivided interest in the mine and in the ore in question; the
court below found this fact and the Supreme Court approved
it; the court below also found that the defendant was the owner
of the other interest.   The property so owned in common was
known as the Wild Bill claim.   The defendant also owned and
was the sole owner of what was known as the Gray Rock Mining
claim.   The defendant contended that none of the ore which it
was taking out belonged to the plaintiff, and alleged that it was
part of a vein which had its apex within the surface ground of
the Gray Rock, of which it was the sole owner.   It will further
appear from the record of the case that the defendant refused
to allow the plaintiff to take any portion of the ore, of which
the court below and the Supreme Court found that it was a co-
owner to the extent of one-third.   Those facts constituted waste
and injury to the interest of the plaintiff in the property.   It
also constituted an ouster.   (See Freeman on Co-tenancy, Sec.
292; *Phelan* v. *Smith,* 100 Cal. 158.)   This was waste and in-
jury under the common law, because of the ouster, and because,
also, of the fact that the defendant was not only taking its
share of the profits, but refused to allow the plaintiff its share
thereof, and because of the fact, which further appears in the
record, that the plaintiff alleged that the defendant, unless re-
strained from so doing, would continue in those wrongs, *i. e.*
not only taking out the ore, but refusing plaintiff its share in

the ore, etc. There can be no doubt that equity under the former practice would entertain a suit for an injunction in aid of an action at law under such circumstances. We believe that the decision in the Anaconda case should be so far modified as to confine the decision of the Court to the fàcts involved in the case. Then there would be no reversal of the case.

Counsel admit that appellant's interest in the property was acquired prior to 1895. Therefore, Your Honors are not construing the Act of 1895, which was the law which was construed by the Court in the Anaconda case and the cases which follow it. Your Honors are construing the law of 1864, or 1872, whichever it may be, a different law, a different act, and although similar in some respects to the law of 1895, still different in others; the Court in the Anaconda case reasoned that the act of 1872 did not give the right to an injunction or any other remedy than the remedy of trespass and trover, and that the legislature of 1895 did not consider these remedies sufficient, and, therefore, gave any remedy, including injunction, which might be had if no co-tenancy existed; that case was considering and interpreting one statute, the act of 1895; this Court is called upon to interpret another statute, the act of 1864, or 1872; and although these statutes are somewhat similar, the rule of *stare decisis* does not apply. (See *Wood* v. *Brady,* 150 U. S. 18.) And so as to the Anaconda Company case. The decision may well be approved and followed in all cases involving a similar state of facts, but in so far as the decision is sought to be made to apply to all co-tenancies in common, it should be modified so as to be confined to cases involving the same facts. Still reviewing the Anaconda cause, let us ascertain the meaning of the various words used in the law of 1864, and this is the act upon which plaintiff's right is based. In attempting to interpret these laws, we should take into consideration the subject matter of the statute, which subject matter is, first, the nature of the ownership, and, second, the nature of the property, and also the law theretofore existing. It cannot be said that to use property in the way in which such property is com-

monly used, necessarily constitutes an injury to the property
when the same is held by tenants in common.    There is no
property susceptible of being used, or calculated to be used,
which could not be owned by two or more tenants in common;
and there is no property which is not more or less injured or
lessened in value by its use, and it may well be said that there
is no property which does not deteriorate in value when in use.
Consequently, to use property may or may not be to injure or
abuse it or lessen it in value within the meaning of the statutes.
If the property is used in a way the owners thereof contem-
plated it should be used, then, in the meaning of the statutes,
there is no injury, no abuse, no destruction; there is simply
an enjoyment of the property.    (See Freeman on Co-tenancies,
Sec. 249 *a;* see, also *McCord* v. *Mining Co.,* 64 Cal. 134; *Job*
v. *Potton L. R.* (XX Eq.), p. 84; *Lenfers* v. *Henke,* 73 Ill.
405; *Wood* v. *Carp. R. I. Co.,* 47 Mich. 65; *Wood* v. *Carp. R.
I. Co.,* 50 Mich. 522; *In re Saeger Estate,* 92 Mich. 186.)

The principle seems to be this:    That A exercises exclusive
ownership in property, or assumes so to do, when he seeks to
control it in such a manner as to deprive his fellow co-tenant
from his right to use the same.    And it seems to be well settled,
and equally logical, that where A seeks to prevent B from using
the common property in the way such property is ordinarily
used, A is then assuming and exercising exclusive ownership
of the property.    (See Freeman on Co-tenancies, Sec. 318.)
The ownership and the nature of the property must be consid-
ered; we are of the opinion that to use property held in common
in the way such property is by its nature intended to be used,
is not waste, is not injury, is not a destruction of the property.
So that we contend that, under the act of 1865, the legislature
did not intend to prohibit the right of one co-tenant to use
property in the way such property was intended by its nature
to be used, provided, always, that each co-owner recognizes fully
and fairly the rights and equity of his co-tenant to use the same
and to share in the profits thereof; and provided, also, that the
manner of exercising this use is of such a nature as character-

izes the ordinary prudent business man of affairs. Such a co-tenant is exercising his own right and his own interest in the property, which the law says he may do so long as he does not interfere with the right of his fellow co-tenant to use the same in the same manner and to share in the profits equally. He is merely enjoying his right. Such a use is *"damnum absque injuria"*; it is the result of the exercise of a lawful right, and there can be no injury in the meaning of the law; and we maintain that the statute itself so interprets these various words. After specifying particular acts, it says, "or otherwise injure or abuse;" and again, it says, "shall have his action for the injury;"—so that the act complained of must be what in law constitutes an injury or abuse, and for one who owns property to use it is not an abuse or an injury necessarily, although such an act would constitute the wrong if done by a stranger.

Interpreted as we interpret the law of 1895, the law is not unconstitutional as to any co-tenancy; but if the construction of that law as announced in the dictum in the Anaconda case is to be followed, then the law would be unconstitutional as to all co-tenancies having their origin prior to July 1, 1895, because under the statute of 1864, as contained in the Compiled Statutes, and until the act of 1895, the co-owner was allowed to work the mine in a proper manner, subject only to an action of trover or an action of trespass. (See *Anaconda Co.* v. *B. & B. M. Co.,* 17 Mont. at bot. of page 526, and p. 525.)

Counsel for appellants insist that injunction would lie in this case under the act of 1872. We differ from counsel in this regard. We insist that no right to an injunction was granted by the law of 1872. The statute itself seems the answer to the claim of counsel. The only remedy given by this statute is an action of trover or an action of trespass, and then only "his action of trespass or trover for the injury," that is, the injury done, not a threatened injury. Again we say that this law must be construed with reference to the subject matter. Confining ourselves to the remedy, it will be seen at once that the statute does not mean that co-tenant plaintiff shall have the same judg-

ment as he would if the co-tenancy did not exist; because a co-tenant claiming the same judgment as would be given as against a stranger, would be exercising exclusive ownership of the property. His judgment must be for the "injury" done to his share. If "A" works a mine owned by himself and "B," "B" could not at common law maintain an action for his share of the profits. (See *McCord* v. *Mining Co.,* 64 Cal. 134.) Probably he can under the law of 1864.

We do differ from counsel, and we do claim that no new wrongs are created by the statute of 1864 or of 1872. At common law, one co-tenant could practically maintain the sole possession of personal property and no action would lie, because his possession was consistent with his title; but any act of his which was inconsistent or in conflict with the title and right of his co-tenant, was not only a wrong, but action would lie. (Freeman, Secs. 306, 307.) It was a wrong at common law to take away the common property,—so it was a wrong to destroy or injure it, and so it was to lessen its value or otherwise abuse it. (Freeman on Co-tenancy, Sec. 297.)

Confining ourselves strictly to real estate, the statute of 1864, as continued to 1895, creates absolutely and unqualifiedly no new wrong; under the common law it was a wrong to "assume and exercise exclusive ownership" over real estate, and ejectment would lie, and, if a continuance of the wrong was threatened, a suit in equity in aid of the action at law would be sustained to stay waste; and this act of exercising exclusive ownership might be proved by showing any act inconsistent with the rights of the other co-tenants, such as a sale of the entire title, a denial of the co-tenancy, or using or allowing others to use the property in a way not consistent with its character, as in *Murray* v. *Haverty,* 70 Ill. 318, and in *Davidson* v. *Thompson,* 7 C. E. Green (N. J.) 83; Freeman, Sec. 302. And from Sections 297 to 303 of Freeman, it will be seen that not only was each of the acts mentioned in the statute a wrong at common law, but each was a wrong for which a remedy was given, ejectment, trespass, trespass on the case, according to the nature

of the wrongful act; ejectment for assuming and exercising exclusive ownership; trespass on the case for an abuse or injury which lessened in value; trespass for a total destruction. These laws and every statute must be construed with reference to the subject matter; and the words "abuse," "injure," "lessen," "destroy" and "lessen in value" must be so interpreted as not to destroy the inherent right of the owner of the property or of an interest therein to use the same.

The man who makes two blades of grass grow where only one formerly grew has been called a public benefactor. Counsel desire to change this, so as to say that one co-tenant may prevent a ranch from being cultivated, water from being used, coal from being extracted, timber from being cut—to prevent every industry of the state from being carried on, when two or more are the owners thereof. No man can injure (and we use the word in its legal sense) the property of another by the lawful exercise of his own right. The lawful exercise of ownership is not necessarily an injury, although it may cause damage—this is *damnum absque injuria.* Thus A may by the lawful exercise of his own enjoyment of his own farm cause a loss, or damage to, or lessening of the value of, his neighbor's farm; but the act would be *"damnum absque injuria."* So A, who is a co-tenant, owns a several and distinct interest, and the lawful exercise of his own right to enjoy his own interest, so long as he does not prevent his co-tenants from enjoying their interests, is not injury within the meaning of the law; again it is *damnum absque injuria.* Co-tenants do not impliedly make promises; but the duty is imposed upon them by law, because of their almost fiduciary relation, that they shall not injure (in the legal sense) the interests of one another; neither one promises the others anything. But the law says that they occupy such a position or relation towards the property that neither shall take advantage of the relation so as to wrong the other; and if he does so, then his act is a wrong for which the law gives a remedy.

When A and B locate a mine, they must do work and labor

thereon—perhaps by sinking a shaft thereon; certainly, if A did the work, it would not be considered an injury because by so doing he extracted ore therefrom. In course of time they apply for patent and obtain it; this patent includes every right given by the statute; under section 2322 by virtue of the patent they have the right to the "possession and enjoyment" of the surface and every vein the top or apex of which lies within the surface boundaries. That is the right that A has and that B has; it enters into the grant to them—each of them can enjoy it to the extent of conveying it to be enjoyed as fully as he could enjoy it himself, and his grantee has the same right to enjoy and convey *ad infinitum*; to take away that right would be unconstitutional. To enjoy a vein, lode or ledge is to use it in the way a vein, lode or ledge is capable of being used by its very nature.

Suppose again that A buys a horse from B, not as a partner but as a tenant in common, and suppose that this law of 1872 is a part of this contract; the same law was a part of the assumed contract at common law; cannot A use the horse? Or a mowing machine, cannot A use the mowing machine? Does not B know that A expects to enjoy his right therein, and does not A know that B expects to enjoy his right therein—the right to use it, and does that use constitute an injury within the meaning of the statute? Such use did not constitute any wrong at common law, although every act specified in the statute was a wrong at common law.

There is no vested right of which plaintiff is deprived by the statute of 1899. If ore has been removed prior to 1899 by defendant, for the ore so removed plaintiff had a cause of action; we are not asking that he shall be prevented from bringing his action. That is not what he is seeking in this application. He seeks to prevent us from exercising our right in the future; that necessarily refers not to a past act, for which plaintiff may have his remedy, but for an act to be done in the future; so there can be no vested right to the form of action for an injury done; and there cannot be a vested right to have a cause of action for a future injury. The right of action in

trover or trespass is still preserved by the act of 1899; and plaintiff is given the further right to demand his share of the ore upon the dump. No right is given to the working co-tenant which he did not, in our opinion, always have; he cannot commit waste; he must not interfere with any co-tenant in his occupancy; he must enjoy the property in a miner-like manner; and he must account for the profits. Even assuming that under the act of 1872 injunction would lie in all cases, the only remedy of which plaintiff is deprived is injunction to prevent defendant from doing, not what he obligated himself from doing, but that which the statute (so interpreted) said he should not do; there is no constitutional right to a particular remedy for a tort. (*Campbell* v. *Mining Co.,* 83 Fed. 645.)

Brief of Respondent in Reply, on Constitutionality of House Bill No. 1.

The statute of 1872 gives the right of trover and trespass for the wrongs mentioned in the statute; it gives no other remedies. And we may remark here incidentally that it does not give injunctions; and that the statute does not say that such a co-tenant shall have the same judgment that he would have against a stranger. These (trover and trespass) were actions that the co-tenant did not have at common law except under peculiar circumstances; he had no action of account for "receiving" more than his just share, except under the statute of Anne, (Freeman on Co-tenancy, Sec. 270); he could not maintain an action of ejectment unless ouster was proved or conceded, (*Id.* Sec. 291). There is nothing to be gained by pursuing this subject; it is enough to say that generally speaking trover and trespass would not lie at common law, that equity furnished certain remedies, injunction very seldom, and to stay waste only in certain cases. Remembering the presumption in favor of the decisions appealed from, then it follows that if Heinze Bros. would have the right to work the mine as a co-tenant either under the common law or under the

law of 1872, then it will be presumed that their right was acquired at that time (1872) or prior thereto—the record being silent as to that.

What were and what are the rights of the co-tenant of a mining claim, the co-tenancy having been created under the law of 1872, or prior thereto? One co-tenant of a farm (except perhaps in Montana) has very much more liberal rights—as against a lazy, unwilling or a grasping or an improvident co-tenant, he may farm the land, husband its crops, and then the profits are his without any accounting. (*Henderson* v. *Eason,* 17 Adol. & Ellis, 702; *Le Barron* v. *Babcock,* 122 N. Y. 153; *Chambers* v. *Chambers,* 3 Hawks, 232; *Pico* v. *Columbet,* 12 Cal. 414; *McCord* v. *Oakland Q. M. Co.,* 64 Cal. 134.) In the early English law there was no right given to one co-tenant as against another to stay legal waste (Jones on Real Property, Sec. 1911), and the writ was not granted except where the act was a malicious or wanton destruction; the right to an account for receiving more than his share was given by statute known as the Statute of Anne, or Westminster 2 C. (See *McCord* v. *Oakland Q. M. Co.,* 64 Cal. 134-143; Vol. 11, Ency. Pl. & Pr. pp. 767 and 770; *Mott* v. *Underwood,* 51 Am. St. 711-715, and cases above cited.) This rule depended upon the fact that each co-tenant had a right to the possession of each and every part of the property. It is not waste for one or two or more co-tenants to farm land (see *LeBarron* v. *Babcock,* 122 N. Y. *supra*); neither is it waste for one of two or more co-tenants of a mining claim to work a mine in the usual way and extract ore therefrom, and by so doing he is not "chargeable with waste, or liable to the other co-tenants in any way, if he does not exclude them." (Jones on Law of Real Property, Sec. 1914; *McCord* v. *Oakland Q. M. Co.,* 64 Cal. 134; *Lynn's Appeal,* 31 Penn. St. 44, 72 Am. Dec. 721; *Crouch* v. *Puryear,* 10 Am. Dec. 528; *Reed* v. *Reed,* 16 N. J. Eq. 248; *Appeal of Fulmer,* 18 Atl. 493; *Findlay* v. *Smith,* 6 Munf. (Va.) 134; *Wood* v. *Carp River I. Co.,* 47 Mich. 65; *Sayers* v. *Hoskinson,* 1 Atl. 308; same case, 110 Pa. St. 473.) And it is to be remembered

that that which is waste when the act is done by a tenant for life is not necessarily waste when done by a co-tenant. (See Jones on Real Prop. Sec. 1911.) Other cases upon the same point and to the same effect might be cited almost indefinitely. The above will suffice, not only to show what is waste, but to show also that that which is waste in the old settled country of England is not necessarily waste in a new country; also to show that for one co-tenant to use property held in common after the manner which that property is usually used and supposed to be used, is neither waste nor an injury to the property, neither does such use, in the eyes of the law, lessen the value of such property; for at common law an action would lie for said acts, if they were injuries.

So we insist that under the law prior to the statute of 1872, and under the law of 1872, no injunction would be granted to one co-tenant to restrain another from working a mining claim in a proper, miner-like manner, and not refusing to allow his co-tenant to join in the work. And, it follows, that if the question of contractual rights is involved in this case, then the law of 1895 is unconstitutional as to all co-tenancies theretofore existing, or which had their origin from co-tenancies theretofore existing—and consequently House Bill No. 1 cannot be said to be unconstitutional as to plaintiff, because that law enlarges and does not impair plaintiff's rights. However, does House Bill No. 1 impair any obligation of any contract? In other words, is there necessarily any contractual relation between tenants in common? Of course tenants in common may make contracts between themselves, such contracts are not involved in this case, but does the mere fact of co-tenancy establish contractual relations? We think not. We have looked in vain for any language in any case indicating any contract arising from this relation. Counsel have cited no cases decisive of such a question. They cite cases from California in which it is held that a law which abolishes joint tenancies is unconstitutional as to those theretofore existing. The cases cited (whatever they decide) stand by themselves as authorities.

The great weight of decisions is against the conclusion of the California Supreme Court. (*Miller* v. *Dennett,* 6 N. H. 109; *Bambaugh* v. *Bambaugh,* 11 S. & R. 191; *Burghhardt* v. *Turner,* 12 Pick. 534-539.)

. Each co-tenant, however small his share may be, has certain rights; he has the right to the possession of the entire property —so has his co-tenants, each one being so entitled by virtue ·of his own right; the interest of each is distinct, the rights of each may be, generally are, obtained at different times and under different deeds and titles. At common law the remedies of a co-tenant were limited to actions of tort entirely. He could not sue his co-tenant *ex contractu.* (See *Shepard* v. *Richards,* 2 Gray 424.) There is no contract between co-tenants. (See *Edsall* v. *Merrill,* 37 N. J. Eq. at p. 115.) There is no privity between them. (*Williams* v. *Sutton,* 43 Cal. 75; see Greenleaf, Sec. 189; see also Freeman on Co-ten. Sec. 169-170, 172.) No estoppel against one affects the other; because the moiety of each is independent of the other. (Freeman, Sec. 168.) All the acts specified in the law of 1872, in the law of 1895, and in the first clause of the law 1899, are torts; and the constitutional prohibition against the impairing of the obligation of contracts does not apply. (See *State of Louisiana* v. *New Orleans,* 109 U. S. 285.) There was no contract at common law between co-tenants not to use the property; the laws of 1872, 1895 and 1899 do not provide remedies for agreements, but remedies for torts.

· What obligation of what contract existing between co-tenants is impaired by House Bill No. 1, the law of 1895 or the law of 1872? What promise to do or not to do. There is no such contract, and consequently there can be no obligation of any contract by any of the bills mentioned; and the clause of the Constitution which prohibits the enactment of any law impairing the obligation of contracts, is not involved in this controversy. Let us consider House Bill No. 1 and see what wrongs or imperfections in the law the legislature intendeed to remedy. It is a well known rule of interpretation of statutes that this

should be done. It is also a well known rule of interpretation that the subject matter of the law should be considered. In the first place, then, no act of a co-tenant is made a wrong by any of these statutes which·act was not a wrong at common law—not a wrong arising from a contract between co-tenants, but a tort, an injury done to the right of ·the other co-tenant as to his moiety. To assume and exercise exclusive ownership of the common property was a wrong; if it was personal property, the injured co-tenant had one remedy and this was "but to take this from him who hath done to him the wrong . * *· * when he can see his time." He could not replevy it; detinue would not lie. (Freeman on Co-tenancy, Secs. 287 to 289.) The law of 1895 gave any form of action appropriate against a stranger. The law of 1872 gave such a co-tenant his action in trover,—but no new wrong is made; it is the old wrong with a new remedy. If the property so held in common and over which one co-tenant assumed and exercised exclusive control, was real estate, the non-consenting co-tenant· had his remedy by ejectment; but this remedy was not satisfactory, because the entry of the wrong-doing co-tenant being lawful, ouster must be proved or acts amounting to an ouster. The law of 1872 gives trespass; the act of 1895 gives any action appropriate if against a stranger. It is still the same old wrong; but now it is just as though a stranger was the guilty party, and certainly there would be no contract to be enforced in such a case. "To take away"—this is the next; it was a wrong at common law; no action of replevin would lie; as we have seen; because each had the right to each part of the property; trover would lie only in certain cases. (See Freeman, Sec. 306.)· Under the act of 1872 trover would lie; and under 1895 any appropriate action. "To destroy." Here the wronged co-tenant had the right to trover, because here was an ouster; but the act of 1895 ·gives any appropriate action as if against a stranger. But at common law the property must be "destroyed or something equivalent to· it—something which, as it were amounts to an ouster, etc." (Freeman, Secs. 306 and

307.) So the Code adds: "To lessen in value"—or otherwise injure and abuse. We take these together, because they amount to the same thing. At common law, the destruction, or injury or abuse, as we have just seen, must be of such a character as to amount to ouster. The act of 1895 gives any action as if the act had been committed by a stranger. All the old actions remain, we do not undertake to give them all; and in 1872 certain new actions were given, and in 1895 any action appropriate as against a stranger was given. But absolutely and certainly no act becomes a wrong which was not before a wrong. And absolutely and certainly no new right in the property itself was given either by the act of 1872 or 1895; and consequently the act of 1899 does not take away any contract right of the non-consenting owner. Neither the act of 1872 nor the act of 1895 gave to any co-tenant, past or present, the right to have the property lie idle, to keep a house vacant, which might otherwise have been occupied; or to insist that the horse owned in common should not be driven—or to play "dog in the manger" as to any property of which he was one of two or more co-tenants. It merely gave him new actions for old wrongs—for those acts which always have been and always will be wrong. All of the acts mentioned in these laws were and are torts; there may be vested rights in judgments for torts, in actions for torts already committed; but there can be no vested rights to a particular form of action for a tort not yet committed. These laws do not say that acts which are injuries to or destructful of property when committed by a stranger are necessarily injuries when committed by a co-owner of the property. When considering what acts are wrongs, the court must still consider the nature of the property and also the relation which the parties to the action sustain to it and to each other. If a stranger cultivates the land it is a trespass; certainly it would not be when done by one co-tenant; if a stranger to the title drives a horse against the will of the owner, it would be a trespass—would it be if the driving was the act of a co-owner? This general principle to which we refer is

well illustrated in the opinion of the court in *Appeal of Fulmer,* 18 Atl. 493. So the law of 1895 does not make wrong what was right before; but does permit the application of any appropriate remedy to what was always wrongful before, and which owing to the strict rule of the common law was before either not the subject of any action as between co-tenants, or of such a nature that only trespass or trover would lie under the law of 1872. This law did not undertake to say that acts wrongful on the part of a stranger to the title were necessarily wrongs as between co-tenants. In interpreting the law, we must consider the nature of the subject; the legislature of 1872 and 1895 were dealing with property held by a peculiar title— held by co-tenants, each of whom held and owned an undivided interest in each particle of the property, which ownership gave to each one of them the opportunity to do wrong to the other, at the same time that it gave to each of them the right to use and enjoy the property in the way that that particular kind of property was by its nature calculated to be enjoyed; the legislature did undertake to give an action to a co-tenant as against his co-tenant for any such wrong, in 1872 an action in trespass or trover, in 1895 any appropriate action, under both laws in the same manner as though the co-tenancy did not exist;—but it did not intend to take away and did not take away and could not take away any right which each co-tenant had to use the common property; it did not take away, or intend to take away, neither could it take away the right which one co-tenant had to use a horse held in common, even though his co-tenant refused to use it, or the right to use water held in common, even though his co-tenant does not desire to use it, or to use a mine as mines are used and enjoyed, even though his co-tenant does not wish to use or enjoy it.

Let us submit House Bill No. 1 to the test of a brief analysis: (a) It is denominated An Act to amend Section 592 of the Code of Civil Procedure. It re-inacts without change Section 592 and then adds certain qualifications and limitations in the form of a proviso. If, then, there are any amend-

ments to this section at all, we must find them in this proviso. The first paragraph provides "that nothing herein contained shall prevent one co-tenant or join tenant, or any number of co-tenants or joint tenants, acting together less than all from entering on the common property at any point or points not then in the actual occupancy of the non-joining co-tenants or joint tenants and enjoying all the rights of occupancy of the property without waste." This is general and applies to all kinds of property held in any species of tenancy in common. If this be an amendment, it can only affect the first paragraph of section 592, which provides that "If any person shall assume and exercise exclusive ownership over  *  *  *  any property held in joint tenancy," etc. At common law one tenant in common could not assume and exercise exclusive ownership over the common property. Now this first paragraph in the proviso does not say that the right of occupancy provided therein, which shall be without waste, is to be exclusive. It does not deny the non-occupying tenant the right to enter and occupy and enjoy without waste the property occupied by them.

(b)   The next clause, which is the one affecting the property under consideration in this case, provides that "in the case of mining property from mining the same in a miner-like manner and extracting, milling and disposing of the ore from the common property, paying its or their own expenses, and subject to accounting to the non-joining co-tenant, or joint tenant for the net profits of such mining operations, if any made." There is still another, and the most important of all, provision for the protection of the non-working tenant, to-wit: "But nothing herein shall prevent or preclude the co-tenant or joint tenant from receiving his, its or their proportionate share of all ore or ores on the dump upon payment or tendering payment of the actual cost of mining the same."

The working co-tenant must mine the property in a miner-like manner. He can not gut the mine or mine it in such a way as to injure the property. Now we submit upon these provisions the following observations:

1.   The non-working co-tenant, instead of being despoiled of his interest by this act, has its value enhanced. There is no impairment of his property, but there is a betterment of it.

2.   The value of his interest in the mine is what can be taken out of it by mining it in a proper way. He has the option to receive his ore upon the dump and thus have a partition of the ores in kind laid down to his hand upon the dump. To be sure, he has to give or tender his proportionate share of the cost of mining, but with the ore on the dump he has the means by which to raise the money if he does not have it otherwise. Much is said in counsel's argument about the right of partition as a remedy to get rid of the non-working co-tenant. But this remedy is a very inadequate one. The Court might judicially know that there is not a mine in Montana which can be partitioned in kind. The only way to partition is by sale. And when it comes to this, the poor co-tenant without means is absolutely at the mercy of the richer co-tenant with means. But under the provisions of this statute the non-working co-tenant can have a partition of the ores as they are mined and placed upon the dump. If the non-working co-tenant does not elect to take his share of the ore, he can allow the working co-tenant to mill the same or treat it otherwise at his own expense, subject, how-ever, to the right to use the common product for the payment of these expenses, and thus share in the net profits. Bear in mind that the mining must be done in a miner-like manner, and that this applies to the treatment of the ores. All proper economy must be exercised and if there is anything of real value in the ore it is represented by the net profits, and the non-working co-tenant is secured in this act to his just share of the same. If it should turn out that the ore is of such little value that there is no profit, but a loss, the burden falls upon the in-dustrious working co-tenant, whom the learned counsel in their unwonted zeal see fit to denominate robbers and despoilers.

The foregoing observations expose the unjustness of the criticism made upon this act. On the contrary, this act is most carefully drawn and guards the interests of the non-working

co-tenant with all the tenderness and care given by an affectionate parent to an infant child. The non-working co-tenant is the pet of this act. It does not injure him in any vested right which he may have. This act gives to the non-working co-tenant every dollar of the net profit which can be realized out of the mine. This is all that he has in it, or that he ever had in it. It even gives him the further right to take his own ores and treat them himself if he is not willing that his associates should treat them; and all he can make out of his share of the ores after the expenses of mining in a miner-like manner have been paid, he gets under the provisions of this act. Now wherein is he despoiled of his property?

The learned counsel lay great emphasis upon the right which they claim the non-working co-tenant has to have the ore remain in place until he should consent to its being mined or until the mine should be partitioned or sold. It must be remembered that in determining the right of one co-tenant in relation to his fellow co-tenant the nature of the property right of each must be taken into consideration. Each one has rights which the other must respect; the right of each is defined and fixed by law. There is no vested right in a refusal to consent to such use of the property as its nature will admit of. The act under consideration does not take away the property of the co-tenant, but it provides for the better use and enjoyment of the property.

Now we submit that the act under consideration cannot be void as an unconstitutional interference with private property. As we have seen, it gives every advantage to the non-working tenant; it enhances the value of his property. The possession of the property is valuable in proportion to the uses and enjoyment which can be gotten out of it. Counsel for appellants contend that one co-tenant has a vested right in his undivided interest in the common property to hold it without using it, no matter how detrimental such holding may be to the interests of his fellow co-tenant. This statute, we submit, adjusts the equities of the parties as nearly as possible according to natural justice.

In the first place, House Bill No. 1 is a remedial statute. It is the province of the legislature to determine by appropriate legislation the public policies of the state. The Supreme Court in the case of *A. C. M. Co.* v. *B. A. & P. Co.,* 17 Mont., proceeded upon the supposition that the act of 1872 and likewise the act of 1895 wrought a change in the common law as to the use and enjoyment of mining property. And the public were led to believe from this decision that one co-tenant could not work his mine and take out ore and get the money out of the same without the consent of his co-tenant. The legislature by House Bill No. 1 determined that such a rule regulating the use of mining properties was detrimental to the public good, and House Bill No. 1 was intended as a remedy for this defect. The purpose of the act then was purely remedial. It was not to divest any interest of one co-tenant out of him and vest it in the other co-tenant, or any other person. Its purpose and its very provisions, as we have seen, were to protect with the utmost care the right of the non-consenting co-tenant. Its purpose was to regulate the use of the property so as to enhance the value of the property to its owner. Ore in its natural place in the earth can contribute no rational enjoyment; nor be of any beneficial use to its owner while it is so situated, nor contribute any benefit to the public at large. To put it within the power of one owner by his non-action to preclude his co-tenant, who desired to use the property for that purpose for which it could be used, from using his property is not only impolitic but wrong in principle. House Bill No. 1 provides a remedy by which it is sought to prevent this injustice and to enable all the tenants in common in a mining property to enjoy to the fullest their several interests therein.

"The right to a particular remedy is not a vested right. It is the general rule, and the exceptions are of those peculiar cases in which the remedy is a part of the right itself. It is within the legislative province to give a new and additional remedy for a right or equity already in existence. It may abolish old remedies and substitute new. Any rule or regulation

in regard to the remedy which does not, under pretense of modifying or regulating it, take away or impair the right itself, cannot be regarded as beyond the province of legislation." (Cooley on Constitutional Limitations, 443 *et seq.*)  Much has been said in appellant's argument about vested rights.  But the question arises, What is a vested right in a constitutional sense?  Upon this subject see Cooley on Constitutional Limitations, page 438 *et seq.*  The change made by legislation in property which does not take the property away from the owner, but enhances its value, is not obnoxious to the constitutional provision protecting vested rights.  Any such law which enhances the value of the property or promotes the beneficial use of the same and thus indirectly enhances the value, is not unconstitutional upon the ground that it interferes with vested rights.  (*Annabele* v. *Patch,* 3 Pick. 363; *Miller* v. *Miller,* 16 Mass. 60.)

But appellant's counsel contend that "if the statute is purely remedial, it is invalid because it is repugnant to Section 1 of the 14th Amendment to the Constitution of the United States, in that it denies to persons the equal protection of the laws." The answer to this is obvious.  A law may be the law of the land without being a general law. Laws public in their objects may, unless express constitutional provision forbids, be either general or local in their application; they may embrace many subjects or one, and they may extend to all citizens or be confined to particular classes, as minors or married women, bankers or traders, and the like." (Cooley on Constitutional Limitations, page 482, note 2.)  And the legislature must determine whether particular rules shall extend to the whole state and all its citizens, or, on the other hand, to subdivisions of a state or a single class of its citizens only.  (*Id.*)  If the laws be otherwise unobjectionable, all that can be required in these cases is that they be general in their application to the class or locality to which they apply, and they are then public in character, and of their propriety and policy the legislature must judge."

Applying these elementary constitutional principles to the case under consideration we observe that House Bill No. 1, in that part of it affecting the working of mines, is made for a single class of persons, to-wit: Joint tenants and tenants in common. This is a particular class and this act affects property held in this particular mode. When a person acquires property under this kind of tenure he does it with the understanding that the legislature has power to make enactments regulating the ownership and use and enjoyment of this class of property different from other classes of property held by different kinds of tenure.

7.   Appellant's · counsel further contend that House Bill No. 1 is unconstitutional as to all rights which had accrued before its passage. In other words that it·is retroactive and impairs the obligation of contracts and interferes with vested rights.   *Our Constitution does not prohibit retroactive legislation.*   It provides that the legislature shall not pass an act *ex post facto* and which impairs the obligation of contracts.   But this is not prohibiting retroactive legislation.   (Cooley on Constitutional Limitations, p. 456; *Beach* v. *Walker,* 6 Conn. 190-197; *Goshen* v. *Stonington,* 4 Conn. 209-221, 10 Am. Dec. 121, note p. 132; 1 Kent's Commentaries, p. 456.)

MR. JUSTICE PIGOTT delivered the opinion of the Court.

The former opinion in this case is reported in 24 Montana, at page 125, and in 60 Pacific Reporter, at page 1039.   Being inclined to the view that, if the provisos of House Bill No. 1 of the Session Laws of 1899 (Laws of 1899, page 134, hereinafter referred to) are applicable to co-tenancies created prior to the passage of that bill, the injunction was probably too broad in its terms, we granted a rehearing, and the cause has been again argued.   The facts upon which the original decision was based are stated in the former opinion.   The following facts are pertinent to the question which we shall consider upon the rehearing:   The plaintiff and the defendants Heinze are, and since 1893 have been, tenants in common of the Snohomish

and Tramway lode mining claims. The defendant administrator and the defendant Larkin, as heir, assert that the equitable title to the undivided interests of which the plaintiff is the legal owner is in the heir, but this is controverted by the plaintiff. The defendant Montana Ore Purchasing Company owns the Rarus lode mining claim, and this defendant and the defendants Heinze had entered the Snohomish and Tramway from the Rarus through underground workings of the latter, had mined large quantities of valuable ore from the veins of the common property, had hoisted and removed the same through the Rarus shaft, and had appropriated it to their own use,—all without the consent of the plaintiff. These acts they threatened to continue doing. In its former decision this Court reversed the order of the district court refusing to grant an injunction *pendente lite,* the effect of which was, in the particular case, a direction to the court below to issue the injunction as prayed, restraining the defendants from entering upon and mining the common property at any place. If the defendants who are co-owners with the plaintiff in the Snohomish and Tramway should sink a shaft or make an opening on either one of these claims, and mine and extract ore therefrom, a question different from that determined in the former decision would necessarily arise. The constitutionality of Section 592 of the Code of Civil Procedure, as amended by the Act of February 28, 1899, commonly known as "House Bill No. 1," would be involved; if it be constitutional when applied to the co-tenancy between the plaintiff and the Heinzes, and the defendants in mining and removing the ore through openings on the Snohomish or Tramway should bring themselves within the provisos of the Act, the injunction would be too broad. We think the Court is therefore in duty bound to determine whether the Act, if intended to be applicable to co-tenancies existing at the time of its passage, is, as to such co-tenancies, repugnant to the Constitution. The plaintiff argues that the Act attempts to deprive co-tenants whose estate existed when the Act of 1899 became operative, of their property without

due process of law, disturbs their vested rights, and is a law impairing the obligations of contracts.

We are satisfied that the provisos of House Bill No. 1 of the Laws of 1899 were intended to apply as well to co-tenants whose estates were in existence when the law was passed, as to those whose estates have been or may be created after its passage. Does the amendment made by the Act of 1899 to Section 592 of the Code of Civil Procedure disturb or impair the vested rights of co-tenants whose estates were in existence at the time the amendment became operative? If it does, it is repugnant to those parts of Sections 3 and 27 of Article III of the Constitution of the State declaring that all persons have the natural, essential and inalienable right of acquiring, possessing and protecting property, and ordaining that no person shall be deprived of property without due process of law. If it does, it is repugnant also to the "due process of law" clause of the Fourteenth Amendment to the Federal Constitution.

In 1845 the general assembly of Illinois passed the following statute, entitled An Act Concerning "Joint Rights and Obligations" (Rev. St. Ill. 1845, p. 299):

"Section 1. * * * If partition be not made between joint tenants, the parts of those who die first shall not accrue to the survivors, but descend or pass by devise, and shall be subject to debts, dower, charges, etc., or transmissible to executors or administrators, and be considered, to every intent and purpose, in the same view as if such deceased joint tenants had been tenants in common.

"Sec. 2. If any person shall assume and exercise exclusive control [afterwards changed to 'ownership'] over, or take away, destroy, lessen in value, or otherwise injure or abuse any property held in joint tenancy, tenancy in common or coparcenary, the party aggrieved shall have his action of trespass or trover for the injury, in the same manner as he would have if such joint tenancy, tenancy in common, or coparcenary did not exist. ·

"Sec. 3.  All joint obligations and covenants shall be taken and held to be joint and several obligations and covenants."

Section 2 received an interpretation in *Benjamin* v. *Stremple,* 13 Illinois, 466, and *Boyle* v. *Levings,* 28 Illinois, 314, decided in 1851 and 1862, respectively.  These three sections were adopted by Montana.  At the first session of the legislative assembly of the Territory of Montana an Act entitled "An Act Concerning Joint Rights and Obligations," approved February 8, 1865, was passed (Bannack Statutes, p. 454). It is as follows:

"Section 1.  If any partition be not made between joint tenants, the property of those who die first shall not accrue to the survivor or survivors, but descend or pass by devise, and shall be subject to debts, dower, charges, etc., or transmissible to execution or administration, and be considered to every intent and purpose in the same view as if such deceased joint tenants had been tenants in common.

"Sec. 2.  If any person shall assume and exercise exclusive ownership over, or take away, destroy, lessen in value, or otherwise injure or abuse any property held in joint tenancy, tenancy in common or copartenary, the party aggrieved shall have his action of trespass or trover for the injury in the same manner as he would have if such joint tenancy, tenancy in common or copartenary did not exist.

"Sec. 3.  All joint obligations and covenants shall hereafter be taken and held to be joint and several obligations and covenants.

"Sec. 4.  This act to take effect and be in force from and after its passage."

Thereafter the provisions of the Act of 1865 were included in an Act entitled "An Act revising, enacting and codifying the general and permanent laws of Montana Territory," the Act of 1865 constituting Chapter 36 of the compilation of 1871-72, the subject of the chapter being designated as "Joint Rights."  In the subsequent compilation of 1887 the provisions of the Act of 1865 were re-enacted without change, appearing

as Chapter 77 of the general laws, and found at page 1006 of the Compiled Statutes of 1887, the chapter being entitled "Joint Rights." Until the adoption of the Code of Civil Procedure of 1895, the Act of 1865 remained in force as originally passed. For more than thirty years, therefore, the Act of 1865 constituted the only legislation of this territory and state touching the subjects affected by it. What, then, was the purpose and what the effect of these enactments, which were among the earliest legislative steps taken by the territorial government, and which remained for so long a time unchanged?

By its title the Act declares that the subject sought to be affected by its provisions is "Joint Rights and Obligations," and, as the third section of the law treats specifically of "Joint Obligations," it should seem clear that, if the title of the Act may be treated as any evidence of its meaning, sections 1 and 2 were designed to treat of "joint rights." It is hardly needful to observe that, if the provisions of the enacting portion of the statute actually depart from the purpose indicated by the title, they would not (under the Organic Act as it then was) be restricted by it; but if sections 1 and 2 render the meaning ambiguous, or leave the legislative intent doubtful, the avowed purpose of the legislation, as the purpose is declared in the title, would prove, at the least, of benefit in the effort to ascertain the design of that branch of the government whose purposes, when ascertained, must be respected and announced by the judiciary. We find that by the first section of the Act itself the legislative assembly plainly intended to destroy the right of survivorship which constituted the distinguishing feature of the species of tenure known as "joint tenancy," and the provisions and unmistakable purpose of the Act are thus far consistent with its title, for, manifestly, such a substantial modification of the rights of joint tenants deals exclusively with "joint rights," and accounts, at least in part, for that portion of the title which declares that the Act is one concerning "joint rights." We cannot agree with the courts which hold that the legislature has power to convert existing joint tenancies into tenancies in common;

the right of survivorship—the indispensable ingredient and characteristic of the estate, and not a mere expectancy or possibility, as, for example, is the inchoate right of dower—accrues as a vested right when and as soon as the joint tenancy is created, and the legislature is without authority to devest or interfere with such right.  A joint tenant cannot be so deprived of his property.  Constitutional limitations, state and national, prohibit it.  We observe, therefore, that the first section was not and could not have been retrospective in its operation, but that it affected subsequently accruing rights only, which, in the absence of the statute, would have constituted joint tenancies. Turning, now, to the second section, and expecting, by reason of the terms of the title, to find that its provisions relate either to "joint rights" or to "joint obligations," we are surprised to find its language more suited to legislation concerning remedial procedure than to either of the subjects indicated by the title. It provides that if "any person" (not necessarily a co-tenant) "shall assume and exercise exclusive ownership over, or take away, destroy, lessen in value, or otherwise injure or abuse any property held in joint tenancy, tenancy in common, or copartenary," then "the party aggrieved shall have his action of trespass or trover for the injury," and that this aggrieved party shall have such action "in the same manner as he would have if such joint tenancy, tenancy in common, or copartenary did not exist." Without consideration, for the present, of the significance of the word "any" in the first line of the section, and assuming that the section relates solely to co-tenants, what was its purpose and effect as to them?  It declares that, under the circumstances described, "the aggrieved party (co-tenant) shall have his action of trespass or trover for the injury."  A superficial examination of this provision would naturally induce the conclusion that it relates only to the remedy "for the injury" to an aggrieved co-tenant; but no very serious reflection is required to suggest the indisputable proposition that some, at least, of the acts recited in the section do not constitute "injuries" to the co-tenant, or make him an "aggrieved party,"

unless the statute modified the rights of co-tenants; for instance, no wrong was done under the common law if one co-tenant, without the consent of the other owners, in the proper way mined and took away the product from the subject of the common ownership which had been acquired for the purpose of mining, and was adapted to that use, or worked in a miner-like manner mines open when the co-tenancy was created, and removed the ores and deposits, although the value of the land might be lessened thereby.

Whether these sections worked a change in the law by creating rights not theretofore existing, or provided remedies only, is the important and difficult question presented in the case at bar. If merely remedial, then they did no more than provide additional means of redress for the violation of rights recognized at law or in equity. If, on the other hand, these sections created new rights in property, and incidentally prescribed remedies for the invasion of such rights, it will be sufficient, for the purposes of the present inquiry, to determine whether the supposed right asserted by the plaintiff was so created, and whether it became vested before the amendment of 1899 went into effect; and the extent of the changes made by the Act of 1865, with respect to the obligations and liabilities of co-tenants the one to the other need not be examined, except in so far as a discussion of them may be necessary to a clear understanding of the points here presented.

Before the passage of the statute of 1865, a tenant in common, although liable in trespass to his co-tenant for an unlawful destruction of the common property or of part of it, or of the interest of the co-tenant, had the right to "assume and exercise exclusive ownership over" (provided neither ouster nor conversion resulted), "or take away, * * * lessen in value, or otherwise injure or abuse" the common property (provided the act did not amount to ouster, waste, conversion, or unlawful destruction), and hence the exercise of that right could not operate as an "injury;" in other words: Under the common law one tenant in common is not aggrieved,—that is

to say, he has suffered no legal injury,—by his co-tenant's assuming and exercising exclusive ownership over, taking away, lessening in value, or otherwise injuring or abusing the common property, unless the act amounts to an ouster, to waste, to a conversion, or to an unlawful destruction of the common property or of some part of it, or of the interest of the other tenant.  If, therefore, this section does not affect joint (or common) rights, as the title would indicate that it does, and if it relates exclusively to a remedy, it manifestly constitutes an attempt by the legislature to create a privilege to resort to a judicial procedure for the purpose of preventing the exercise of certain lawful rights; such an attempt would, of course, be futile, as it would exceed the constitutional powers of any legislative body, and hence such a purpose ought not to be attributed to the legislative assembly, unless no other construction of the law is consistent with the legislative purpose within the scope of its recognized authority.  A remedy without a right to be protected thereby, or a wrong without a correlative right, is inconceivable.  Although thus forced to reject the view that this section relates exclusively to remedial procedure, we are still impelled to recognize and concede the fact that it plainly purports to make provision for actions between co-tenants which could not have been maintained prior to the Act, and that such actions should be maintainable by reason of certain wrongs which formerly were not wrongs and could not have constituted causes of action.  Such, in effect, were the principles upon which *Benjamin* v. *Stremple* and *Boyle* v. *Levings, supra,* were based, and the statute bore this interpretation at the time it was adopted from Illinois.  When a statute has been adopted by this state from another state, after a judicial interpretation, suitable to the conditions of this state, has been placed upon it by the parent state, the legislative assembly will, ordinarily, be presumed to have adopted the interpretation with the statute, and the courts will depart from it only for strong reasons.  (*Stadler* v. *First National Bank of Helena,* 22 Mont. 190, 203, 56 Pac. 111.)

In view of this plain purpose, declared in unmistakable terms in the Act; in view of the fact that this purpose could be accomplished only by modifying the relations incident to co-tenancy and creating new rights in the co-tenants; and in view of the avowed object of the statute as declared in its title, the conclusion cannot be escaped that the legislative assembly clearly intended by this awkwardly worded section to alter substantially the rights of co-tenants, make violations of those rights constitute legal injuries, and designate the appropriate remedies for such injuries. We may observe also that it is only by this construction that the seemingly proper legal significance of the word "any" in the first line of section 2 is understood, for if this section is not intended to declare the rights and incidentally prescribe the remedies of co-tenaants *inter sese,* but merely regulates remedies, then it must be held to give a separate cause of action to each co-tenant against "any" person who does any of the things recited therein, and to entitle each co-tenant to maintain (though perhaps the judgment would be only for the amount of damages suffered by him) such an action against a stranger "in the same manner as he would have if such joint tenancy, tenancy in common or coparcenary did not exist." Possibly it may have been intended that as against a stranger committing any of the acts denounced as wrongs, a tenant might as sole plaintiff maintain trespass or trover to enforce his rights under circumstances where at the common law he would be required to join his co-tenants with him or, upon their refusal to join, make them defendants. Subject to certain exceptions, joint tenants and tenants in common must, by the rules of the common law, join in actions for damages resulting from tortious wrongs done to the common property; and if one purpose of the statute of 1865 was to permit a co-tenant when aggrieved by a stranger to recover as sole plaintiff for the injury suffered by him, it does seem somewhat peculiar that the statute prescribed the actions of trespass and trover as the forms to be employed in redressing his grievances, and omitted reference to those other actions—such as trespass

on the case, replevin, detinue and the like—which are the ap*propriate and exclusive remedies for many wrongs as serious as are those which may be righted by judgments in trespass or trover. We need not, however, determine whether the statute of 1865 enlarged the rights or remedies of co-tenants as against strangers; that question is not directly involved in the case at bar. Suffice it to say that the statute did create rights in co-tenants among themselves, and if the statute provided also rights or remedies, or both, in favor of co-tenants as against strangers, this provision in no wise affected the provision in respect of the rights of co-tenants *inter sese*. If in a case involving the rights and remedies of co-tenants as against strangers the determination should be reached that the statute of 1865 was designed to give rights or remedies as against strangers, such a decision would not militate against the conclusion which we have announced touching the rights of co-tenants among themselves; and, neither purpose being in conflict with the other, each would be recognized and made effectual.

Counsel in their learned and able arguments make incursions into the domain of ethics and make plausible suggestions touching the moral rights and remediless wrongs of co-tenants, which they assert existed prior to the Act of 1865, though they concede that no action or suit could be invoked to protect the rights or redress or prevent the wrongs; but we are of the opinion that the purpose of this section was to destroy those character-istics of tenancies in common wherein they mainly differ from holdings in severalty, leaving the necessity for voluntary or judicial partition as the chief remnant of the distinguishing features of this species of ownership,—in other words, the first and second sections, which concern "Joint Rights," practically convert a joint tenancy into a tenancy in common, and then convert tenancy in common into an estate with many (whether with all we need not decide) of the rights and privileges incident to several ownership and giving the actions of trespass and trover for their protection.

Having thus reached the conclusion that the second section

of the statute created new property rights in co-tenants, we must hold, as we have already held concerning the first section, that it could not under the organic law have been retroactive in its operation. As is admitted, the co-tenancy in the case at bar came into existence after the Act of 1865 became law and before 1895. For one co-tenant without the consent of the other to mine and remove ore from the common property is an unauthorized taking away and lessening in value of the property within the meaning of the Act of 1865; it is a permanent injury thereto (*Murray* v. *Haverty*, 70 Ill. 316; *Harrigan* v. *Lynch*, 21 Mont. 36, 52 Pac. 642), and the principle declared in the Act of 1865, at least as respects co-tenancies in quartz and placer mining claims, is that the common property shall remain an entirety until partition, and that no one of the owners may, without the consent of the other owners, work it or lessen its intrinsic value by mining and removing the ore or deposits.

With these views as to the force and effect of this early and long-standing legislation, we now approach the consideration of the more recent enactments concerning this subject. In the Code of Civil Procedure adopted in 1895, Section 2 of the Act of 1865 became Section 592, being a portion of Title III of Part II of that Code. Section 592 omits the word "copartenary" and also the words "of trespass or trover" from the language of Section 2 of the Act of 1865, but in other respects it is the same as section 2 of the original Act. We do not think that the placing of this so slightly modified section into the Code of Civil Procedure and into that part of it entitled "Parties to Civil Actions" is of real significance, or could possibly operate vitally to alter the legal meaning and effect of the long-established legislation; and this view is strengthened by Section 3454 of the Code of Civil Procedure, which is as follows:

"The provisions of this Code, so far as they are substantially the same as existing statutes or the common law, must be construed as continuations thereof, and not as new enactments."
We therefore regard Section 592 of the Code of Civil Proced-

ure as a substantial re-enactment or continuance of the old Act of 1865, except in so far as it was modified by the omission of the words "of trespass or trover." In *Anaconda Copper Mining Company* v. *Butte & Boston Mining Company,* 17 Montana, 519, 43 Pacific Reporter, 924, this Court after an examination of the section, considered especially as an amendment to the previous legislation, held that its effect was to enlarge the remedies of co-tenants by permitting any appropriate action for such injuries as were contemplated by that section and the statutes substantially re-enacted by it; this case was followed by *Red Mountain Consolidated Mining Company* v. *Esler,* 18 Montana, 174, 44 Pacific Reporter, 523; by *Connole* v. *Boston & Montana Consolidated Copper and Silver Mining Company,* 20 Montana, 523, 52 Pacific Reporter, 263; and by *Harrigan* v. *Lynch, supra.* If the decision in the *Anaconda Case* deserves adverse criticism, as counsel for the defendants insist that it does, it is not because of the result reached, but rather because of the undue significance attached to the amendment omitting the words "of trespass or trover." It should seem that even under the Act of 1865 the tenant who was entitled to maintain an action of trespass against his co-tenant in the same manner as he would have if such joint tenancy or tenancy in common did not exist was, in the proper case, entitled to an injunction as an ancillary remedy to prevent a repeated or continuing trespass,—the right to such equitable aid not being the creature of the statute but arising under the operation of the principles of equity applicable to all cases of continuing and irreparable trespass, both in order to prevent a multiplicity of suits and in order to prevent the commission of a threatened legal wrong, for which, when done, an action at law for damages would be an inadequate remedy. We feel satisfied that injunction would be an appropriate auxiliary remedy in such a case, especially where, as in Montana, law and equity are administered by the same court and often in the same case; but in any event it is apparent from the authorities last cited that the remedy by injunction, if not granted by the Act of

1865, is granted by section 592, and the giving of this new remedy for an old wrong violates no constitutional right. With this understanding of the meaning and general purpose of the Act of 1865, with its light amendment of 1895, we now address ourselves to the amending provisos contained in the Act of 1899, commonly called "House Bill No. 1," and entitled "An Act to amend Section 592 of the Code of Civil Procedure of Montana, relating to property held in joint tenancy and tenancy in common." This Act is as follows:

"Be it enacted by the Legislative Assembly of the State of Montana:

"Section 1.    That Section 592 of the Code of Civil Procedure of Montana, be and the same is hereby amended so as to read as follows:

"Sec. 592.    If any person shall assume and exercise exclusive ownership over, or take away, destroy, lessen in value or otherwise injure or abuse any property held in joint tenancy, or tenancy in common, the party aggrieved shall have his action for the injury in the same manner as he would have if such joint tenancy or tenancy in common did not exist.

"Provided:    That nothing herein contained shall prevent one co-tenant or joint tenant or any number of co-tenants or joint tenants acting together less than all, from enterng on the common property at any point or points not then in the actual occupancy of the non-joining co-tenants or joint tenants and enjoying all rights of occupancy of the property, without waste; and in the case of mining property, from mining the same in a minerlike manner, and extracting, milling and disposing of the ore from the common property, paying its or their own expenses, and subject to accounting to the non-joining co-tenant or joint tenant for the net profits of such mining operations, if any made; and all liens for labor and materials incurred in such mining shall attach only to the undivided interest or interests of the working co-tenants or joint tenants, but nothing herein shall prevent or preclude the co-tenant or joint tenant, not joining in the operation of such mining property from re-

ceiving his, its, or their proportionate share of all ore or ores on the dump upon payment or tendering payment of the actual cost of mining the same."

If our interpretation of the second section of the Act of 1865 is correct, and if we are justified also in the opinion that the section, when so interpreted, could not be retrospective in its operation and could apply to and affect only estates created after the Act was passed, it seems quite clear that a like view must be taken with respect to the amendment of 1899 touching the working of a mine and the taking of ore therefrom by one tenant without the consent of his co-tenants; for it was plainly intended to restore to one class of co-tenants certain valuable rights which were taken away by the Act of 1865, and to deprive another class of valuable rights which were created by that Act. Careful examination of the amendment must, we think, result in the view that it could not impair any rights then existing and is therefore inoperative as to them; its language is not such as would seem appropriate for the purpose of any positive enactment, but is rather suitable as expressive of merely legislative construction. Its declaration is "that nothing herein contained shall prevent," and while, if such a clause had been inserted in the original Act of 1865, it would have operated as a restriction upon the legislative force of the main body of the section, yet, considered as an amendment, it must be regarded as trespassing upon the powers and functions of courts or as meaning that "nothing contained in this section shall so operate on tenancies hereafter created as to prevent," etc. The preventive force of an Act, as well as its positive effect, is to be determined by the judiciary and, though the legislative assembly may and often does alter existing statutes because of their legal meaning as ascertained and announced by the courts, the lawmaking power cannot determine the past legal force and effect of any statute; such power would involve the right to review and reverse the rulings of those tribunals to which the people have intrusted exclusively the power and duty of interpreting all Acts and determining both their positive force and

their preventive operation. Whatever rights are created or conferred by the amendment of 1899 did not exist theretofore and, unless we have erred in the views expressed as to the force and effect of the Act of 1865 and as to the vested rights of co-tenants under it before the amendment, the conclusion that the amendment does not apply to property rights of persons whose co-tenancies were created prior to the time it took effect must be correct. Our opinion is, therefore, that any co-tenant whose estate was created after the Act of 1865 took effect and before the amendment of 1899 became operative is entitled to restrain by injunction the commission by his co-tenant of any of the acts denounced in the original statute of 1865 and in Section 592 of the Code of Civil Procedure, provided, of course, that the remedy at law is inadequate and the threatened injury irreparable,—in other words, we do not consider that any rights in property conferred upon or taken away from co-tenants by the Act of 1865 are affected by the Act of 1899, and that the latter Act is only prospective in its operation. Further than they are involved in the case at bar we do not attempt to define the character or extent of the rights so created by the Act of 1865. In so far as the part of the amendment under consideration and affecting the present case was intended to apply to estates existing at the time the Act of 1899 became operative, it must be held to be an attempt to disturb or destroy vested rights, and therefore to be void. Whether the amendment is void as to the plaintiff upon the further ground that it impairs the obligation of a contract is a question which, being unnecessary to a decision, is reserved.

The order refusing an injunction is reversed and the cause is remanded.

*Reversed and Remanded.*

Mr. Justice Milburn, not having heard the argument, does not participate in the foregoing opinion.

Rehearing denied March 4, 1901.