STATE ex rel. RANKIN, Attorney General, Plaintiff, v.
STATE BOARD OF EXAMINERS et al., Defendants.

(No. 4,846.)

(Submitted April 6, 1921. Decided May 2, 1921.)

[197 Pac. 988.]

*Mandamus—State Treasury Notes—Statutes—Constitution—*
*"Debt or Liability"—Statutes—Adoption from Another State*
*—Construction.*

State Treasury Notes—Statute—Constitutionality—"Debt or Liability."

1. *Held,* that the issuance and sale of treasury notes authorized by
Chapter 13, Laws of 1921, in anticipation of the payment of taxes
levied, to procure funds with which to pay outstanding valid claims
against and current expenses of the state, do not constitute the in-
curring of a "debt or liability" within the meaning of section 2,
Article XIII, of the state Constitution.

Statutes—Constitutionality—Rule.

2. The constitutionality of a legislative enactment is *prima facie*
assumed, every intendment being in favor of upholding it, and
will be upheld unless it appears to be unconstitutional beyond a
reasonable doubt.

Same—Adoption from Another State After Construction—Effect.

3. By the adoption of a statute of another state after construc-
tion thereof by its courts, the construction thus placed upon it is
impliedly approved, provided the statute as adopted is silent as to
the matter of construction.

State Indebtedness—Constitutional · Limitation—What Deemed Cash on
Hand.

4. The debt or liability the incurring of which is prohibited by
section 2 of Article XIII of the Constitution without a majority
approval by the people at a general election is one which singly
or in the aggregate will obligate the state to an amount in excess
of $100,000 cash on hand and revenues provided by the legislature
for the two years intervening between sessions of the assembly,
since revenue for which provision has been made may constructively
be considered as cash on hand.

Original application by the State, on the relation of Wel-
lington D. Rankin, Attorney General, as a member of the
State Board of Examiners, for writ of mandate to compel the
said board and Joseph M. Dixon, Governor, and Charles T.
Stewart, Secretary of State, as members thereof, to publish

---

3. Construction of adopted statute, see notes in 1 Ann. Cas. 147;
Ann. Cas. 1917B, 651, 660.

notice calling for bids on the sale of treasury notes authorized by Chapter 13, Laws of 1921.   Writ issued.

*Mr. Wellington D. Rankin, pro se,* submitted a brief and argued the cause orally.

(NOTE: Inasmuch as the contentions made by counsel in his brief, and authorities cited in their support, are incorporated in the opinion of the court, it is deemed unnecessary to set them forth here.)

No appearance in behalf of Defendants.

MR. JUSTICE GALEN delivered the opinion of the court.

This is an original application for a writ of mandate directed to the state board of examiners and the governor and secretary of state, constituting a majority of the board, to compel it to publish notice calling for bids on the sale of treasury notes of the state of Montana and to make sale of same, as required by law.

The state board of examiners is composed of the governor, secretary of state and attorney general. (Sec. 20, Art. VII, of the Constitution; sec. 226, Rev. Codes.)   By Chapter 13 of the Laws enacted by the Seventeenth Legislative Assembly in Extraordinary Session (Laws 1921), it is made the duty of the state board of examiners, prior to the close of the fiscal year of 1922, by resolution to be entered in the minutes of its proceedings, to order the sale of treasury notes in such amount as in their discretion may appear best, provided that there must not be issued or sold during the year 1921 an amount exceeding in par value, plus interest to date of maturity, the total tax levy in the year for general state purposes, nor shall there be sold or permitted to be sold during the year 1921 more than one-half of the treasury notes authorized by the Act.   And as to the year 1922, the board is required not to order sold nor sell such treasury notes in amount exceeding

in total par value, plus interest to date of maturity, the taxes levied in the year 1922 for general state purposes.

From the affidavit made the basis of this application, it appears that the state board of examiners, on March 28, 1921, pursuant to the terms of such Act, by proper resolution entered of record, directed the sale and issuance of a total principal sum of one million dollars ($1,000,000) par value of treasury notes of the state of Montana for the year 1921; but that the board has failed and refused to direct publication of notice of the sale of such treasury notes or to take further steps looking to the negotiation and sale thereof. One member of such board, the relator herein, insists that it is the plain duty of the board to now proceed with publication of notice of sale of the treasury notes and to make sale thereof as authorized by law and the resolution adopted by the board.

It is provided by the Act that "immediately upon the passage and adoption by the board of any such resolution, the said board of examiners shall publish for ten (10) days in two daily newspapers of general circulation published in the state of Montana, a notice specifying the notes to be sold, the amount thereof, the place of payment and the maximum interest rate, that the denominations will be made to suit such purchasers; that interest will be payable semi-annually and asking that bids therefor, specifying in addition to the price offered, the rate of interest at which the bidder will purchase the said notes and likewise the denominations desired, be submitted to the said board at or prior to the day and hour to be specified in the notice, which time shall not be less than ten (10) days from the publication of the notice."

It appears that there is now, and at the time of the adoption of the resolution authorizing the sale of such treasury notes was, outstanding in taxes levied for the current year for general state purposes and payable into the general fund of the state in the year 1921, the sum of $1,028,000, in addition to revenue accruing to the general fund from sources other than taxation, exceeding the total amount of the treasury notes ordered

to be issued, plus the interest to maturity for the year 1921, and that no like treasury notes have been issued or are now outstanding. Further, that at present there are no moneys available in the general fund for any purpose, and that there will not be sufficient funds during the current year for the payment of warrants drawn on the general fund.

The purpose of the Act is made clear from the preamble, which reads as follows: "It appearing that there are out-standing and unpaid valid claims chargeable against the general fund of the state of Montana in an amount greatly in excess of the actual cash on hand in said fund available for the payment thereof, and that in addition thereto the current expenses of the state and lawful charges against said fund are constantly accruing in an amount exceeding for the time being and temporarily, the actual cash income of said fund, but that there is outstanding in taxes levied, in addition to revenue constantly accruing to said fund from sources other than taxation, an amount in excess of three million dollars, available for the payment of any warrants, claims or charges against the said general fund immediately upon receipt of the same in cash in the treasury of the state: Now, therefore, be it enacted," *etc.* By demurrer filed, question is raised as to the constitutionality of the Act authorizing the issuance and sale of the treasury notes. (Chap. 13, Laws of the Seventeenth Legislative Assembly in Extraordinary Session.)

Section 2 of Article XIII of the Constitution provides in [1-3] part: "No debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election." The constitutionality of a legislative enactment is *prima facie* presumed and every intendment is in favor of upholding it, unless it appears to be unconstitutional beyond

a reasonable doubt. (*State ex rel. Bonner* v. *Dixon, ante,* p. 58, 195 Pac. 841, and cases there collected.) In application of the language contained in this section of the Constitution, question is raised as to whether the issuance of treasury notes as authorized by the Act, constitutes the creation of a "debt or liability" such as is prohibited. A comparison of the Act under consideration with Chapter 94 of the Laws of Idaho of 1919, indicates clearly that our legislature copied substantially the Idaho law, and it is settled by decisions of this court that by the adoption of the statute of another state, the construction theretofore placed hereon by the courts of such state is impliedly approved, provided our own statute is silent as to the matter of construction. (*Territory* v. *Stears,* 2 Mont. 324; *Lindley* v. *Davis,* 6 Mont. 453, 13 Pac. 118; *First Nat. Bank of Butte* v. *Bell etc. Min. Co.,* 8 Mont. 32, 19 Pac. 403; *Price* v. *Lush,* 10 Mont. 61, 9 L. R. A. 467, 24 Pac. 749; *Stackpole* v. *Hallahan,* 16 Mont. 40, 28 L. R. A. 502, 40 Pac. 80; *Murray* v. *Heinze,* 17 Mont. 353, 42 Pac. 1057, 43 Pac. 714; *Largey* v. *Chapman,* 18 Mont. 563, 46 Pac. 808; *Stadler* v. *First Nat. Bank,* 22 Mont. 190, 74 Am. St. Rep. 582, 56 Pac. 111; *Butte & B. Consol. Min. Co.* v. *Montana Ore Purchasing Co.,* 25 Mont. 41, 63 Pac. 825; *Winslow* v. *Dundom,* 46 Mont. 71, 125 Pac. 136; *Miller* v. *Miller,* 47 Mont. 150, 131 Pac. 23; *Moreland* v. *Monarch Min. etc. Co.,* 55 Mont. 419, 178 Pac. 175.)

The Act under consideration became a law March 24, 1921. and long prior thereto, on June 11, 1919, the supreme court of Idaho, in the case of *State* v. *Eagleson,* 32 Idaho, 276, 181 Pac. 924, in upholding the constitutionality of the Idaho statute, speaking through Mr. Chief Justice Morgan, said: "The Chapter under consideration authorizes the state board of examiners to order the sale of such amounts of treasury notes as it may deem best, provided it shall not order, nor permit to be sold during the year 1919 an amount of the total par value, plus interest to date of maturity, exceeding the total tax levy in that year for general state purposes payable into

the treasury in 1920, and during 1920 it shall not order nor permit to be sold an amount exceeding, in like manner, the taxes levied in that year for general state purposes payable into the treasury in 1921. It is further provided that upon the adoption by the state board of examiners of a resolution directing the sale of notes, the treasurer shall perform certain acts, in the law specified, looking to the sale thereof. The purpose of this action is to procure the performance of these acts.

"The defendant answered, in effect, that if treasury notes be issued as prayed for, the indebtedness thereby created will, together with the bonded indebtedness of the state now outstanding, be in excess of the amount permitted by Article VIII, par. 1, of the Constitution which, so far as it is material to this case, provides: 'The legislature shall not in any manner create any debt or debts, liability or liabilities, which shall * * * exceed in the aggregate the sum of two million dollars. * * * ' The answer was demurred to, on the ground that it does not state facts sufficient to constitute a defense, and the only question presented is as to whether or not the treasury notes in question will, if issued and sold, constitute an indebtedness within the meaning of that section of the Constitution.

"This court, in *Stein* v. *Morrison*, 9 Idaho, 426, at page 451, 75 Pac. 246, at page 254, said: 'The appropriations for current expenses and the raising of revenue to meet those appropriations have been treated by the people in framing and adopting the organic law as a cash transaction.' The decision of the court upon this point is summarized in the syllabus as follows: 'The public revenues may be appropriated by the legislature in anticipation of their receipt, * * * and it is not necessary to the validity of such an appropriation that funds should be in the treasury at the time to meet the same.' 'Such appropriations do not constitute a debt or liability against the state within the provisions of section 1, Article VIII, of the Constitution, * * * .' (See, also, *State* v.

*McCauley,* 15 Cal. 429; *In re Incurring of State Debts,* 19
R. I. 610, 37 Atl. 14; *State* v. *Parkinson,* 5 Nev. 15; *Rhea* v.
*Newman,* 153 Ky. 604, 44 L. R. A. (n. s.) 989, 156 S. W. 154;
*Rowley* v. *Clarke,* 162 Iowa, 732, 144 N. W. 908; *State* v.
*Medbery,* 7 Ohio St. 522; *State* v. *Donahey,* 93 Ohio St. 414,
113 N. E. 263.)

"A question similar to the one before us arose in South
Dakota, where the legislature had provided for the issuance
and sale of state warrants, in anticipation of the payment of
taxes already levied to procure cash with which to pay the
current expenses of state government.  The court held that
'appropriations from the assessed, but uncollected, revenues of
the state, and the issuance of warrants in pursuance thereof,
is not the incurring of an indebtedness,' within the meaning
of a constitutional provision of that state which, so far as this
question is concerned, is the equivalent of our Article VIII,
par. 1.  (*In re State Warrants,* 6 S. D. 518, 55 Am. St. Rep.
852, 62 N. W. 101.)  See, also, *Bryan* v. *Menefee,* 21 Okl. 1,
95 Pac. 471.)  This is the correct rule, and it applies to
treasury notes with equal force as to state warrants."

The South Dakota decision referred to in the Idaho case
construes a statute of the state of South Dakota (Chap. 91,
Laws of 1895), providing for the issuance of state warrants to
defray current expenses based upon revenues not yet col-
lected under constitutional provisions (sec. 2 of Art. XIII
of the Constitution) quite similar in effect to our own.  In
passing upon the validity of the warrants authorized to be
issued in anticipation of available revenues, the supreme court
of South Dakota, in *In re State Warrants,* 6 S. D. 518, 55
Am. St. Rep. 852, 62 N. W. 101, used the following language
by us quoted with approval with respect to the Montana Act
under consideration: "By general law the legislature has
provided for the levy of an annual tax for meeting the
ordinary expenses of the state.  By so providing, in a con-
stitutional manner for the levy of a sufficient tax, it has
provided a revenue, to the extent of the tax, for the payment

of the ordinary or current expenses of the state. It may then make appropriation of such revenue for diverse and specific purposes, within the ordinary expenses of the state, and may authorize the issue of evidence of such appropriation in the form of warrants, without incurring an indebtedness therefor, within the meaning of said section 2, Article XIII, of the Constitution. If this were not so, then the appropriations of each legislature in excess of the cash actually in the hands of the state treasurer, and in the fund from which such appropriations were made, would, to the extent of such excess, constitute the creation of a debt against the state. It is well understood that the aggregate of the general appropriations of each legislature in this, as in other states, generally greatly exceeds the amount of actual cash in the hands of the state treasurer when such appropriations are made. The taxes levied and in process of collection are treated as in the state treasury, though not yet actually paid over to the state treasurer. It has been ruled in several cases, and by high judicial authority, that state funds, so in sight, but not yet in hand, may be anticipated and appropriated as though actually in the possession of the state treasurer. In *State* v. *McCauley*, 15 Cal. 429, 430, the learned Chief Justice Field, speaking for the court said: 'The eighth article (the constitutional article limiting state indebtedness, and corresponding to our section 2, Article XIII) was intended to prevent the state from running into debt, and to keep her expenditures, except in certain cases, within her revenues. These revenues may be appropriated in anticipation of their receipt as effectually as when actually in the treasury.' This case, decided in 1860, has been subsequently several times approved and followed by the supreme court of California. (See *People ex rel. McCauley* v. *Brooks*, 16 Cal. 11, 28, *Koppikus* v. *State Capitol Commissioners*, 16 Cal. 248, 253, and *People* v. *Pacheco*, 27 Cal. 175.) The same question was before the supreme court of Ohio, in *State* v. *Medbery*, 7 Ohio St. 522, where the proposition of the California court was fully indorsed, subject only to the re-

striction based upon a provision of the Ohio Constitution that such appropriations of incoming revenues should not extend beyond the limit of the two years next ensuing. The court says: 'So long as this financial system is carried out in accordance with the requirements of the Constitution (two years' restriction), unless there is a failure or defect of revenue, or the general assembly have failed, for some cause, to provide revenue sufficient to meet the claims against the state, they do not and cannot accumulate into a debt. Under this system of prompt payment of expenses and claims as they accrue, there is, undoubtedly, after the accruing of the claim, and before its actual presentation and payment a period of time intervening in which the claim exists unpaid; but to hold that for this reason a debt is created would be the misapplication of the term 'debt,' and substituting for the fiscal period a point of time between the accruing of the claim and its payment for the purpose of finding a debt; but appropriations having been previously made, and revenue provided for payment, as prescribed by the Constitution, such debts, if they may be so called, are in fact, in respect of the fiscal year, provided for with a view to immediate adjustment and payment. Such financial transactions are not, therefore, to be deemed debts.' The same question is elaborately discussed in *State* v. *Parkinson,* 5 Nev. 15, and the same conclusions reached as by the California and Ohio courts. It would seem, therefore, that, both upon authority and principle, we should be justified in saying that appropriations from the assessed, but not yet collected, revenues of the state, and the issuance of warrants in pursuance and in evidence thereof, is not the incurring of an indebtedness, within the meaning of section 2, Article XIII, of the Constitution.

"At first thought, it may seem difficult to maintain that the issuing of an obligation to pay is not the incurring of an indebtedness; but as aptly said by the court in *State* v. *Parkinson, supra,* 'similar language [prohibiting state indebtedness beyond a designated limit] in the constitutions of other states,

had judicial interpretation before the foundation or adoption of the Constitution of the state, * * * and thus the legal presumption arises that the language was used with reference to such interpretation.' Critically considered, it may constitute the incurring of an indebtedness; but it is not an indebtedness repugnant to the Constitution, because its payment is legally provided for by funds constructively in the treasury. If the drawing of a warrant upon the state treasury is the incurring of indebtedness by the state, then the drawing of such warrant would violate the Constitution, even if there was money in the state treasury to pay it, if the constitutional limit of indebtedness has been reached; for there must always be some time intervening between the drawing of the warrant and its payment, and during such time the indebtedness of the state would be increased beyond the constitutional limit. Such an interpretation of the constitutional limitation would obviously be too hypercritical to be practicable or reasonable. It being once established, as we think it is by the authorities already cited, that the revenues of the state, assessed and in process of collection, may be considered as constructively in the treasury, they may be appropriated and treated as though actually and physically there; and an appropriation of them by the legislature does not constitute the incurring of an indebtedness, within the meaning of section 2, Article XIII.''

In the very recent case of *State ex rel. Bonner* v. *Dixon, ante,* p. 58, 195 Pac. 841, this court, in passing upon the constitutionality of the initiative measure authorizing the issuance of state bonds in the aggregate amount of $5,000,000 for the construction, repair and equipment of buildings for state educational institutions named, said: ''It is not necessary, to constitute a valid appropriation, that the funds be then in the treasury. As a matter of fact, it is very rarely the case that there are funds to meet an appropriation at the very time the appropriation is made.''

In construing our constitutional provision applicable, [4] we have under consideration the meaning of the words

"debt or liability," and in our view, the prohibition intended by these words is the creation of a debt or obligation of the state in excess of cash on hand and revenue provided for for the years 1921 and 1922 between the regular meetings of the legislative assembly. The words "debt" and "liability" as used in this connection are not employed in a technical sense, but have specific reference to the basic warrant and legislative authority on which a state contract must rest and on which alone a public debt must find its sanction in order to obligate the state to pay. (25 R. C. L., sec. 30.) These treasury notes authorized by the Act stand in no different position as an obligation of the state than registered warrants which have been issued constantly and without question by the state in recognition of its obligations for which funds were not immediately available, though in process of collection or reasonably and fairly anticipated. All debts and obligations of the state are paid by warrant (sec. 170, Rev. Codes), and when funds are not immediately available for the payment of warrants issued, it is the duty of the state treasurer to register them, and thereafter they draw interest until called for payment (sec. 181, Rev. Codes). Mr. Justice Holloway, in speaking for this court in *Edwards* v. *County of Lewis and Clark,* 53 Mont. 359, 165 Pac. 297, in discussing the meaning of the words "incur indebtedness or liability," as used in section 5 of Article XIII of the Constitution, and section 2933 of the Revised Codes, limiting the indebtedness or liability of a county for any single purpose to an amount not exceeding $10,000, said: "The terms 'incur indebtedness or liability,' as used in the Constitution, are not synonymous with the term 'borrow money,' as used in section 2933. (7 R. C. L. 944–951.) It is apparent to anyone that the indebtedness represented by the road warrants will not be discharged by issuing bonds, and from the proceeds paying off the warrants, and that no new indebtedness will be incurred. The indebtedness will remain, but the evidence of it will be changed from the warrants to the bonds. The transaction is not unlike that of

the individual who gives his note for an indebtedness represented by a due bill or open account or who borrows from A to pay B. The indebtedness still exists, though it may be evidenced by a different instrument, payable to a different creditor or more effectively secured. Section 5 of Article XIII above has to do with the creation of *new indebtedness or liability.*"

In *State* v. *McCauley*, 15 Cal. 429, quoted from with approval in the South Dakota case, in discussing the effect of California's constitutional limit of indebtedness, the language of which is almost identical with our own, it is said: "The eighth article was intended to prevent the state from running into debt and to keep her expenditures, except in certain cases, within her revenues. These revenues may be appropriated in anticipation of their receipt as effectually as when actually in the treasury. The appropriation of the moneys when received meets the services as they are rendered, thus discharging the liabilities as they arise or rather anticipating and preventing their existence. The appropriation accompanying the services operates, in fact, in the nature of a cash payment."

In our opinion, the debt or liability intended to be prohibited by section 2 of Article XIII of our Constitution is such as is in excess of revenues available or provided for for the appropriation years—that is, for the two years intervening between sessions of the legislative assembly; and not current obligations of the state arising during such period of time for which revenues are actually available or provided. The constitutional limitation has reference to such a liability as singly or in the aggregate will obligate the state to an amount in excess of $100,000 over and above cash on hand and revenues having a potential existence by virtue of existing revenue laws. In the case before us, the funds must be considered *in esse* for the payment of the treasury notes, provision having been made for their levy and collection. The state, in conducting its business by such methods, is in no

different position than the merchant doing business on an assured credit basis in anticipation of accounts due being paid to him at stated intervals. Revenue for which provision is already made may constructively be considered as cash on hand. (25 R. C. L., sec. 30.) Clearly, the character of debts prohibited by the Constitution in excess of $100,000 without majority approval of the people at a general election are such as pass the limit of available cash on hand and revenue for which adequate provision has been made by law for the two-year period intervening between regular sessions of the legislative assembly.

No valid reason appearing why the defendants herein refused to publish notice for the sale of the treasury notes as authorized and required by the Act, or for refusing to proceed with the sale thereof, the writ of mandate will issue commanding the board to proceed with the publication of notice of sale and the sale of the treasury certificates authorized to be sold in the year 1921 pursuant to the Act for the amount authorized by the resolution heretofore adopted by it.

*Writ issued.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS, COOPER and HOLLOWAY concur.