STATE EX REL. DIEDERICHS, RELATOR, v. STATE HIGH-WAY COMMISSION ET AL., RESPONDENTS.

(No. 6,832.)

(Submitted February 9, 1931. Decided February 21, 1931.)

[296 Pac. 1033.]

*Mr. Howard Toole,* for Relator, submitted a brief and argued the cause orally.

*Mr. E. G. Toomey, Amicus Curiae,* submitted a brief on behalf of Relator and argued the cause orally.

208

*Mr. L. A. Foot,* Attorney General, *Mr. J. W. Freeman, Mr. J. W. Speer, Mr. George Y. Patten* and *Mr. Sidney M. Logan,* for Respondents, submitted a brief; *Messrs Freeman* and *Logan* and *Mr. C. N. Davidson,* Assistant Attorney General, argued the cause orally.

*Mr. William T. Pigott, Amicus Curiae,* argued the cause orally.

### Opinion: PER CURIAM.

In this proceeding the relator seeks an injunction restraining the State Highway Commission, the Governor, Secretary of State and State Treasurer from issuing or selling any of the debentures provided for in Chapter 1 of the 1931 Session Laws, which is called the "State Highway Treasury Anticipation Act of 1931."

For the purpose of matching funds set apart by the government in order to build Federal Aid Highways, the Act authorizes the sale of debentures, to be paid from motor fuels' excise taxes, the collection of which is anticipated. It is already provided by statute that all moneys received by the State Treasurer from the collection of motor fuels' excise taxes are to be deposited by him in the state highway fund, and, less refunds, shall be expended by the State Highway Commission "in the construction, reconstruction, betterment, maintenance, administration and engineering on the Federal Highway system of Highways" in this state. (See Chaps. 18 and 19, Session Laws 1927.) The anticipated revenues are greatly in excess of the amount of debentures to be sold.

Chapter 1, Session Laws of 1931, authorizes the sale of State Highway Debentures in the sum of $6,000,000 at the rate of $1,500,000 for each year from 1931 to 1934, inclusive. The proposed debentures bear interest not exceeding five per cent, payable semi-annually, and are to mature serially at the rate of $858,000 during each of the years 1934 to 1939, inclusive, and $852,000 in the year 1940. To pay the principal and in-

terest the Act provides that the excise tax on motor fuels as provided by the twenty-second legislative assembly shall not be reduced so long as any of the debentures are outstanding and unpaid, and a sufficient sum is set aside each year from the proceeds of this tax to meet the debentures maturing the next succeeding year. Chapter 6 of the Laws of 1931 fixes the excise tax on motor fuels at five cents per gallon.

The principal contention made by relator is that Chapter 1 attempts to authorize the creation of a debt or liability in excess of $100,000 without submitting the law to the people, as required by section 2 of Article XIII of our state Constitution, which provides: ''The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election.''

At the threshold we bear in mind that every presumption must be indulged in favor of the constitutionality of the Act; every reasonable doubt must be resolved in favor of legislative action. The question for the court's determination is not whether it is possible to condemn but whether it is possible to uphold the Act. When two constructions are possible, one which will result in declaring the statute constitutional and the other unconstitutional, the court without hesitation will pronounce in favor of its constitutionality. (*State ex rel. Public Service Com.* v. *Brannon,* 86 Mont. 200, 67 A. L. R. 1020,

283 Pac. 202; *State ex rel. Stephens* v. *Keaster*, 82 Mont. 126, 266 Pac. 387, and cases cited.)

Nor is it any concern of the court whether the Act is expedient, wise or unwise. (*State ex rel. Bonner* v. *Dixon*, 59 Mont. 58, 195 Pac. 841.) It is legislative power, not policy, that is drawn in question. And while we are mindful of the presumptions in favor of legislative Acts, yet, being bound to support, protect and defend the Constitution, when an enactment transgresses the constitutional limitations beyond a reasonable doubt, it is our solemn and sworn duty to so declare it. We are mindful, too, that the declarations of constitutions are placed therein to be obeyed, and are not to be frittered away by construction. (*Less* v. *City of Butte*, 28 Mont. 27, 98 Am. St. Rep. 545, 61 L. R. A. 601, 72 Pac. 140.) Our duty in this respect remains the same no matter how urgent may be the desire to obtain money with which to carry on the much needed program of highway construction. As stated by that able jurist, Chief Justice Taney of the United States supreme court, in the famous Dred Scott decision (*Scott* v. *Sandford*, 19 How. (U. S.) 393, 15 L. Ed. 692): "No change in public opinion on questions of public policy can ever be given any weight in construing the provisions of a Constitution where the meaning is clear, for the adoption of a Constitution that might be deemed wise at one time and unwise at another would abrogate the judicial character of the court and make it the reflex of the popular opinion or passion of the day." If the Act in question authorizes the creation of a debt or liability in excess of $100,000 there are two available methods of accomplishing what the Act proposes: one is to amend the Constitution and the other is to obtain the consent of the people at an election for that purpose.

Whether the Act before us, strictly speaking, creates a debt within the purview of this section 2, Article XIII, a question upon which respective counsel have spent much effort, we think it unnecessary to decide, for in our opinion the Act clearly imposes a liability within the contemplation of the section. The

framers of the Constitution provided two methods of raising revenue for public purposes: one the taxation system and the other the license system. (*State* v. *Camp Sing*, 18 Mont. 128, 56 Am. St. Rep. 551, 32 L. R. A. 635, 44 Pac. 516.) Knowing the tendency of governments to run in debt, to incur liabilities, and thereby to affect the faith and credit of the state in matters of finance, thus imposing additional burdens upon the taxpaying public, the framers of the Constitution placed positive limitations upon the power of the legislative assembly to incur a debt or impose a liability upon the state beyond the limit prescribed, without referring the proposition to the electorate for its approval. As to this the comprehensive language of the section leaves no doubt. The first two sentences employ the word "debt" and refer to debt alone, but the third adds the word "liability," a much broader term than "debt." Liability is a broad term, of large and comprehensive significance. In a broad sense it means an obligation one is bound in law or justice to perform. There are many other definitions. (36 C. J. 1050.) The authors of the Constitution used the term advisedly, with a definite purpose. In construing a constitutional provision it is our duty to give meaning to every word, phrase, clause and sentence therein, if it is possible so to do. So whether the law authorizing a contract for the sale of these debentures creates a debt, such as is contemplated by the first two sentences of section 2, is not material. It certainly creates a liability, which includes a debt, for the state is expressly obligated not to reduce the excise taxes on motor fuels fixed by the 22d legislative assembly and to cause the tax to be collected and paid to the debenture holders. This is prohibited by the plain terms of the Constitution unless approved by the people.

The fact that a special fund is created by the imposition of the license or excise tax on motor fuels with which to pay the debentures is of no importance.

Under this contention the legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the "road fund," another the "school

fund," another the "agricultural fund," another the "public health fund," and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation. (*Crick* v. *Rash,* 190 Ky. 820, 229 S. W. 63.)

The fund raised from the motor fuels' excise tax results from one of the constitutional methods of raising public revenues. (*State* v. *Sunburst Refining Co.,* 73 Mont. 68, 235 Pac. 428.) They are state funds and the state has the right to devote the proceeds of this tax to any public purpose it sees fit. Originally the proceeds were paid to the general fund of the state. (Chap. 156, Laws 1921.) Subsequently, only a part was paid into the general fund. (Chap. 150, Laws 1923, and Chap. 186, Laws 1925.) The proceeds from this tax are unlike the fund involved in the case of *State ex rel. Bickford* v. *Cook,* 17 Mont. 529, 43 Pac. 928, 930. In that case the court was dealing with a trust fund, provided for by an Act of Congress, not state funds, and the court in recognition of the importance of that fact said: "The state cannot use the fund created by this Act for any purpose except as provided for by the Act of congress. The state officers have no control over it, except to carry out the trust relation." The same is true of *State ex rel. Armington* v. *Wright,* 17 Mont. 565, 44 Pac. 89, cited and relied upon by respondent. The Act there under consideration did not create a debt nor impose a liability upon the state. The case of *Crick* v. *Rash,* supra, also comments upon the importance of this distinguishing feature.

*State ex rel. Rankin* v. *State Board of Examiners,* 59 Mont. 557, 197 Pac. 988, also presented an entirely different situation. In that case the debt or liability was already in existence, represented by outstanding warrants when the treasury notes were

issued. The issuance of the treasury notes simply changed the form of the existing indebtedness or liability, and did not create one. (*Hotchkiss* v. *Marion*, 12 Mont. 218, 29 Pac. 821; *Parker* v. *City of Butte*, 58 Mont. 531, 193 Pac. 748; *Edwards* v. *Lewis and Clark County*, 53 Mont. 359, 165 Pac. 297; *State ex rel. Toomey* v. *State Board of Examiners*, 74 Mont. 1, 238 Pac. 316.)

The supreme court of Iowa, in a well considered and powerful opinion, declared a somewhat similar Act unconstitutional (*State ex rel. Fletcher* v. *Executive Council*, 207 Iowa, 923, 223 N. W. 737, 743), while the supreme court of South Carolina, by a divided court, sustained an Act also somewhat similar (*State* v. *Moorer*, 152 S. C. 455, 150 S. E. 269), but the constitutional provisions in Iowa and South Carolina are unlike ours.

The creation of an obligation, payable from these funds, is a liability of the state; its effect is to divert a large part of the revenues of the state into the State Highway Fund for a period of ten years, which otherwise might be used to pay the public debt or to defray the general expenses of the government, thus relieving the heavy burden of taxes levied upon property. If the process designed by Chapter 1 does not create a state liability then the legislature undoubtedly could do the same thing with other license taxes, the inheritance taxes, and the net proceeds of mines taxes, all of which are properly considered in determining the limitation of expenditures and appropriations under section 12 of Article XII of our Constitution (*State ex rel. Toomey* v. *State Board of Examiners*, supra), and thus accomplish by indirection what the Constitution prohibits to be done directly.

The people are gravely concerned as to how and the purposes for which their money is spent. They may eagerly desire to sell the proposed debentures, thereby matching the sums provided by a generous Congress, to the end that our state may be afforded good roads without delay; but another measure

pledging excise taxes in large amounts for some special purpose might encounter their definite disapproval.

These examples demonstrate, if any demonstration is needed, the salutary purpose of the constitutional provision here under consideration.

We have reached this decision with a due sense of its great importance and only after a faithful effort to sustain the law. Each member of the court has labored upon this case to the exclusion of other court business ever since it was submitted to us. In the language of the supreme court of Iowa, in *State ex rel. Fletcher* v. *Executive Council*, supra: "The responsibility thus facing us is one not of our seeking, nor of our liking, nor yet one which we would dare evade. We are assured, too, that in the long event the duty we owe, not only to the litigants, but to our co-ordinate departments of government, is to undertake frankly the judicial responsibility which litigation casts upon us, and to declare faithfully our judicial convictions therein. In such a case our primary concern is, and must be, directed to the soundness of our conclusion, and not to its consequences. Consequences are inevitable in every litigation and are commensurate with the magnitude thereof. They are not judicially made nor can we make them less or more." As the great Justice Story said in the *Dartmouth College Case* (4 Wheat. (U. S.) 518, 4 L. Ed. 629): "We have nothing to do but pronounce the law as we find it; and, having done this, our justification must be left to the impartial judgment of our country."

The upshot is that in order to validate the Act it must receive the approval of the electorate.

The last part of section 2, Article XIII, requires that such a law be submitted to the people "at a general election." This provision was a part of the Constitution as originally adopted and was framed at a time when the referendum was comparatively unknown. We think, considering the subject matter of the section, the term "general election" does not mean necessarily the general biennial election. The Constitu-

tion does not say so, and Constitutions ordinarily do not provide the machinery for carrying out their commands; they simply declare what may (or must), and what may (or must) not, be done. We think the "general election" named means a state-wide election at which all the people entitled to vote may vote upon a question affecting them as a whole. Should a great calamity occur requiring the immediate expenditure of funds over $100,000 for the public welfare and safety, can one believe that the legislative assembly, being convened to act in the emergency, cannot fix an election prior to the biennial general election? Common sense denies the supposition.

We now advert to section 1 of Article V of the Constitution as amended in 1905 (see Chap. 61, Laws of 1905), which became effective December 7, 1907, by proclamation of the governor. As amended that section declares that "all elections on measures referred to the people of the state shall be at the biennial regular general election, except when the legislative assembly, by a majority vote, shall order a special election." The special election here named means, of course, a special general election, a state-wide election. It will be noted that the provision refers to *all* measures and no exception is made as to the laws contemplated by section 2 of Article XIII. Indeed, we are inclined to think this amendment is, in a measure, complementary to the provision of section 2, Article XIII, concerning a general election.

A further argument put forth by relator must be noticed. It is that the Act is void because it attempts to bind future legislative assemblies. The statement that one legislative assembly cannot enact a statute which a subsequent assembly may not repeal is correct as an abstract proposition. But one legislative assembly, if not limited by the terms of the Constitution, may enact a statute authorizing a lawful contract, which, if entered into, will be beyond the repealing power of a subsequent assembly. It is true, of course, that a subsequent assembly may, if it sees fit, reduce the exaction of five cents per gallon, if a less exaction will be sufficient to pay the de-

bentures. (*State ex rel. Malott* v. *Board of County Commissioners*, ante, p. 37, 296 Pac. 1.)

It follows that the injunction prayed for must issue, to be in force unless the law be submitted to, and receive the approbation of, the people. And it is so ordered.

MR. JUSTICE ANGSTMAN, Concurring Specially: Having participated in the preparation of the court's opinion, I agree with what is said in it. But in my opinion, determination of this case does not require the drawing of distinctions between debts and liabilities. Chapter 1 clearly attempts to authorize the creation of a debt in excess of $100,000, within the meaning of section 2, Article XIII, of our Constitution, and to be effective, must have the approval of the electors. The word "debt" has no strange and peculiar meaning in section 2. Like any other word in the Constitution it must be given its usual and ordinary meaning, and in construing the Constitution the courts should ascertain and give effect to the intention and purpose, not only of its framers, but of the people who adopted it. (Cooley's Constitutional Limitations, 8th ed., p. 124; *Amos* v. *Matthews*, 99 Fla. 1, 65, 115, 126 South. 308.) The policy of this court in the interpretation of constitutional limitations on the debt contracting power was well stated by Mr. Justice Pigott, speaking for the court in *Jordan* v. *Andrus*, 27 Mont. 22, 69 Pac. 118, 119, as follows: "Similar salutary provisions of organic law have often been frittered away, disregarded or perverted by means of strained and unnatural interpretations. We refuse to follow them."

The reasons stated in the court's opinion supporting the conclusion that the creation of the special fund for the payment of the debentures does not prevent the Act from creating a liability are my reasons why the provision for a special fund does not save the Act from creating a debt. The scheme provided by Chapter 1 diverts public revenues to the payment of a loan by the state as effectually as if the full faith and credit of the state were actually pledged in payment of the debentures.

The fact that it creates a debt within the purview of section 2, Article XIII, is the justification for attempting to make the law imposing the excise tax irrepealable. Much was said by learned counsel for respondents in the brief and oral arguments to the effect that section 2, Article XIII, in the use of the words "levy a tax" means only an *ad valorem* tax. If this were so, then this Act is in conflict with section 2 and a vote of the people would be useless. If that is the correct interpretation to be placed upon section 2, then that section, by construction, would contain this command to the legislature: "You shall not create a debt in any manner unless you provide for the levy of an *ad valorem* tax sufficient to pay the principal and interest within the time provided." Confessedly no *ad valorem* tax has been levied. That construction of section 2 would make it read substantially as the Iowa Constitution which requires "the collection of a direct annual tax." Under such a provision the Iowa supreme court has held that the legislature was without authority to exercise a mortgaging power over future gasoline and motor vehicle license taxes. (*State ex rel. Fletcher* v. *Executive Council,* 207 Iowa, 923, 223 N. W. 737.)

In my opinion, however, the words "levy of a tax" as used in section 2 contemplate only that the legislature when creating a debt shall provide for raising sufficient revenues to pay the principal and interest by either of the constitutional methods of raising revenues for public purposes and that it includes the levy or imposition of a license or excise tax, as here.

This was the construction placed upon similar language appearing in section 12, Article XII, of our state Constitution, in *State ex rel. Toomey* v. *Board of Examiners,* 74 Mont. 1, 238 Pac. 316, and is the construction that has been placed upon section 12 by the legislative and executive departments of the state government throughout the state's history.

MR. JUSTICE MATTHEWS, Dissenting: I cannot concur in the conclusion reached by my learned associates that section

2 of Article XIII of the Constitution requires a submission of the Act before us to a vote of the people, nor in the method of treatment by which they have arrived at that conclusion.

To my mind the basic error manifest in the opinion is in brushing aside the principal question presented, i. e.: Does the "debt" which the Act admittedly authorizes to be created and which will exceed $100,000, fall within the purview of section 2 of Article XIII of the Constitution, and considering only the term "liability" as though independent of the term "debt," as employed in the prohibition?

As the broad term "liability" includes "debt," and the Act provides for the creation of a debt, clearly it also provides for the creation of a liability, but as I read the constitutional prohibition in the light of its context and coexisting provisions on the same subject, no further liability is authorized by the Act than the admittedly authorized debt.

Definitions of the term "liability" are almost as numerous as the cases in which the term is considered (see 36 C. J. 1050), but in construing a constitutional provision, the court must first ascertain its purpose and intent, "taking in its obvious sense the language used" (*State ex rel. Gleason* v. *Stewart*, 57 Mont. 397, 188 Pac. 904), and then, unless words are obviously used in a technical sense, give to the words employed their usual construction in conformity with the purpose and intent of the provision in which they are found. (*Northern Pacific Ry. Co.* v. *Sanders County*, 66 Mont. 608, 214 Pac. 596; *State ex rel. Gillett* v. *Cronin*, 41 Mont. 293, 109 Pac. 144; *Scheffer* v. *Chicago etc. Ry. Co.*, 53 Mont. 302, 163 Pac. 565; see, also, 17 C. J. 1371.)

Technically, of course, the term "liability" is broad enough to include the duty imposed upon the state officers to carry out the provisions of the trust imposed upon them by the Act, but was the term employed in the constitutional prohibition in that sense? "Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon

which every man, learned or unlearned, may be able to trace the leading principles of government." (1 Cooley's Constitutional Limitations, 132.)

The "context" of the article in which the prohibition applied is found is "Public Indebtedness," and the purpose of such a prohibition in a Constitution is to prevent the overburdening of the people by taxation. (*Shields* v. *City of Loveland*, 74 Colo. 27, 218 Pac. 913.) The meaning of the term "liability" as here used must be determined in the light of such context and intent. Used as a check upon the creation of a "public indebtedness" the applicable definition of "liability is the condition of being actually or potentially subject to an obligation, and is more frequently used to denote the latter than the former." (*State* v. *Sheets*, 26 Utah, 105, 72 Pac. 334, 335; *Cochran* v. *United States*, 157 U. S. 286, 39 L. Ed. 704, 15 Sup. Ct. Rep. 628.)

Speaking for this court, Mr. Justice Galen has correctly construed the two terms here under consideration, as follows: "In construing our constitutional provision applicable, we have under consideration the words 'debt or liability' and, in our view, the prohibition intended by these words is the creation of a debt or obligation of the state * * * ; the words 'debt' and 'liability' as used in this connection are not employed in a technical sense, but have specific reference to the basic warrant and legislative authority on which a state contract must rest and on which alone a public debt must find sanction in order to obligate the state to pay." (*State ex rel. Rankin* v. *State Board of Examiners*, 59 Mont. 557, 197 Pac. 988, 992.) Clearly, then, the terms "debt" and "liability" were not used independently in the last sentence of section 2, Article XIII, quoted in the opinion, but were used to prohibit the creation of either an actual obligation of the state (a debt) or a potential obligation (a liability which may attach subsequently, though not presently imposed) affecting the public funds. The two forms of obligation are so clearly allied in the context of the constitutional provision that, if the debt mentioned does

not come within the purview of the prohibition, neither does the "liability."

As I read the prohibition considered, and as I think the "man on the street" would read it, the legislature is prohibited from either providing for the creation of a debt, which the state must in any event pay out of the public funds of the state, or a liability on the part of the state to pay, on failure of other means provided, or other contingency, "in excess of $100,000," unless the Act is first submitted to a vote of the people. As the Act under consideration does not pledge the faith and credit of the state but provides for the payment of interest and principal of the debentures solely from the "Highway Fund," there is no contingent liability imposed upon the state, and the Act provides for, and authorizes only, the creation of a debt." Should the source of repayment provided for in the Act fail, the holders of the debentures sold "will be limited in their rights to the requirement of the proper officers to perform their duties as prescribed by the statutes." (*Allen* v. *Grimes,* 9 Wash. 424, 37 Pac. 662, quoted with approval in *State ex rel. Bickford* v. *Cook,* 17 Mont. 529, 43 Pac. 928, 930.)

The *Bickford Case,* followed by *State ex rel. Armington* v. *Wright,* 17 Mont. 565, 44 Pac. 89, clearly points out that the constitutional prohibitions respecting public moneys, and the appropriation thereof have no application to a debt created (or a liability incurred) which is to be repaid from a special fund, not carved from the general fund of the state. "The provisions of the Constitution * * * restricting the powers of the legislature to create debts within certain limitations, do not obtain."

What is said in the majority opinion with respect to the fund considered in the *Bickford Case,* does not apply to the fund under consideration in the *Armington Case,* where the same conclusion was reached. These cases are in line with the holding generally that where money is borrowed, with the provision of repayment from special funds, such as special assessments for street improvements, construction and maintenance of piers,

canals and the like, in special districts (*Hamilton* v. *Pier District*, 120 Me. 15, 112 Atl. 836; *Kasch* v. *Miller*, 104 Ohio St. 281, 135 N. E. 813; *Fox* v. *City of Bicknell*, 193 Ind. 537, 141 N. E. 222; *Gross* v. *City of Bowdle*, 44 S. D. 132, 182 N. W. 629; *City of Valdosta* v. *Harris*, 156 Ga. 490, 119 S. E. 625); from the income of waterworks and electric light plants (19 R. C. L. 985; *Shelton* v. *City of Los Angeles*, 206 Cal. 544, 275 Pac. 421; *Winston* v. *Spokane*, 12 Wash. 524, 41 Pac. 888; *Shields* v. *City of Loveland*, 74 Colo. 27, 218 Pac. 913); from rentals of state-owned railway (*Wright* v. *Hardwick*, 152 Ga. 302, 109 S. E. 903); from the sale of state-owned lands (*Seattle & L. W. Waterway Co.* v. *Seattle Dock Co.*, 35 Wash. 503, 77 Pac. 845), constitutional provisions such as those under consideration have no application.

It is, however, asserted that the gasoline tax receipts are in fact a part of the general fund of the state, or could be made such by subsequent action of the legislature, and are a source of revenue to the state which must be taken into consideration in making appropriations and, therefore, the rule does not apply. It is true that when the legislature first determined to impose a gasoline tax and throughout subsequent legislation, until the present highway policy was adopted, not all of the receipts from the tax were assigned to the Highway Fund; and it is also true that in *State ex rel. Toomey* v. *State Board*, 74 Mont. 1, 238 Pac. 316, 321, we said that in determining the available amount for "appropriation" the legislature may take into consideration "the total income of the government, derived from all sources," as stated by counsel, but the statement is followed by the significant qualification "subject to be applied to public purposes." A special fund devoted to a special purpose is not "subject to be applied to public purposes," in the sense of general appropriation, for it does not swell the general fund of the state and, without change in the law, cannot be appropriated for any other purpose.

Answering the suggestion that the fund here considered is not such a special fund as considered in the cases cited, be-

cause it was once, in part, diverted to the general fund and might again be so used, in whole or in part, I quote from *People* v. *Murray*, 149 N. Y. 367, 32 L. R. A. 344, 44 N. E. 146: "We assent to the claim of counsel for the appellant that the cities and towns * * * never acquired any irrevocable right to receive the license fees collected. We do not doubt that it would have been competent for the legislature, from the first, to have required all license fees to be paid into the state treasury for general state purposes, or at any time to have changed the practice which was adopted, * * * , but the legislative declaration in the Act of 1896 * * * is in accordance with the uninterrupted understanding that the legislature may devote excise moneys to the uses of cities and towns in which they are collected * * * , and it is now too late to question this construction of the Constitution."

Here is the key to the situation: The moneys diverted, now wholly, to the Highway Fund are the receipts from *excise* taxes imposed for a specific purpose. On this point it is said in *People* v. *Murray*, above, that the constitutional prohibition against "appropriation" of "public moneys" without a two-thirds vote of the legislature—in principle the same as the prohibition considered here—has to do only with "public moneys of the state as contradistinguished from public revenues levied for local purposes by cities * * * under state authority, or moneys which by a long course of legislation, as in the case of excise moneys, have been treated as standing in the same situation." The purpose of the constitutional prohibitions is the protection of those funds in which the general public has a beneficial interest. (*B. F. Sturtevant Co.* v. *Industrial Commission*, 186 Wis. 10, 202 N. W. 324.) The gasoline tax is "an excise or occupational tax" although imposed for revenue purposes. (*State* v. *Sunburst Refining Co.*, 73 Mont. 68, 235 Pac. 428.)

As clearly pointed out early in the history of the state, our Constitution contemplates two systems of raising funds for the conduct of the state affairs, "(1) the taxing system, and (2)

the license system." (*State* v. *Camp Sing*, 18 Mont. 128, 56 Am. St. Rep. 551, 32 L. R. A. 635, 44 Pac. 516, 517.) This case was decided seven years after the adoption of the Constitution, by a court two members of which had taken part in the constitutional convention of 1884, and the prevailing argument was presented by members of the convention which framed the Constitution under consideration, so that the decision should accurately reflect the intention of the framers of the Constitution. The court there said, "If the legislature sees fit, all revenues may be raised by taxation. Taxation is the security for the debts and expenses. The license system is a further provision. As exigencies arise, or do not arise, or cease to exist the license system may be, or need not be, resorted to. That system is elastic and pliable, and can be suited to circumstances." It is there held, after mature deliberation and on logical reasoning, that the limitations on the legislature imposed by Article XII of the Constitution, apply to the taxing system, not to the license system, which is "mentioned by name in only one place in the Constitution. That is the last sentence of section 1, which says: 'The legislative assembly may also impose a license tax.'"

Here the legislative assembly was not dealing with revenue derived from the taxation system, nor even with the ordinary revenue derived from the application of the "license system," but with a properly designated "special fund" brought into being for a special purpose, the relation of purpose and fund being marked.

The subject of adequate highways in the state has long been a problem which has increased by reason of new modes of transportation, out of all proportion to the increase in the population and wealth of the state; with changed conditions imperatively calling for better roads and more of them, the taxation system of financing their construction and maintenance becomes wholly inadequate, and, therefore, the legislature fell back upon the licensing power and seized upon a source of revenue for this purpose which lays the burden upon those who directly

benefit by the work done, and relieves the public at large of a heavy duty theretofore imposed in a great measure upon it. The fund thus created—not by a division of, or a diversion from, the general fund of the state, but by an impost upon those who derive benefit, business and pleasure from the use of the fund—is as clearly and directly connected with the highway program, to the exclusion of other state activities, as are special improvement assessments to the improvements made, or the revenues from municipally owned water and electric light systems to the construction of such works, and becomes a special fund in the same sense as the funds discussed in the *Bickford* and *Armington Cases,* above.

It is stated in the majority opinion that the people have an interest in determining how their money shall be spent. With this I agree, but that interest is confined, in so far as an expression thereof by their vote is concerned, to those laws passed by their representatives, the legislature, as have to do with the disbursement of the general fund of the state. The submission of the Act before us to a vote of the people calls only for an expression of their opinion on an administrative policy, for which submission there is no provision in the Constitution. Attention is called to the fact that the people have already expressed their approval of the diversion of the whole of the gasoline tax to the Highway Fund. (Initiative Measure 31, Laws of 1927, p. 604.)

In the Iowa and Kentucky cases, mentioned in the majority opinion, the fatal defect in similar Acts considered was that the legislature attempted to pledge the faith and credit of the state to the repayment of the loans, in the event the special fund failed. The majority opinion of the supreme court of South Carolina upheld a like Act, in spite of such a pledge, and the dissenting opinion of the Chief Justice of that court clearly indicates that, had it not been for this fact and had he been convinced that the gasoline tax paid into the Highway Fund was a special fund, he would have joined in the majority opinion. His declaration is: "Where there is created no obli-

gation on the part of the state and the proposed improvements
are to be paid out of a designated special source of income, the
state is but the trustee of an express trust to apply such income
to the stated purpose, incurring no liability itself other than
what might spring from the discharge of that trust." (*State*
v. *Moorer*, 152 S. C. 455, 150 S. E. 269, 295.) Here we have
but a provision of the legislature for the creation of an express
trust to be administered by certain state officers, in order to do
presently that which must be ultimately done in order that the
state may receive the full benefit of the trust fund allocated
to this state by the federal government.

No one, knowing the past and present condition of our state
highways and being familiar with the piecemeal work hereto-
fore done with limited funds, can doubt but that the full re-
ceipts from the gasoline tax would be exhausted each year for
the period of the debentures provided for, by a continuation of
the piecemeal system necessitated, unless some means are de-
vised for more efficient use of the funds derived from this source,
and it must be remembered that by a continuance of the piece-
meal work a large part of the federal aid money will be lost
to the state. During the constructive period, which has now
extended over several years, with but a small portion of our
highways constructed, experience has demonstrated that the
full amount of the income from this source has been insufficient
for the needs of this state "of magnificent distances," and we
need not speculate as to whether future legislatures would
deem it wise to divert a part, or the whole, of the income from
the gasoline tax to the general fund, if such speculation has
any bearing on the question before us.

While, therefore, the Act under consideration does tie up
the gasoline tax receipts for several years to come, such im-
pounding cannot conceivably injure the public generally by in-
creasing *ad valorem* taxes, nor affect the general fund of
the state; it is but a provision for doing now what must ulti-
mately be done, and doing it in an effective and economical
manner. What the courts would do in case the legislature

should attempt to divert other taxes to special funds, to the disaster of the general fund and for purposes not directly in accord with the purpose of their imposition or levy, should be met when, or if, such an attempt, is made.

The funds allocated to the state are trust funds, and the legislature but adds thereto further trust funds for the same purpose and in order to secure the federal trust funds.

I agree that the Act may be submitted at a special election under the amendment cited.

I have carefully gone into the remaining questions presented on the hearing of this application, but, as they are not discussed in the majority opinion, I will not here discuss them; suffice it to say that, in my opinion, on no question raised is the unconstitutionality of the Act before us demonstrated beyond a reasonable doubt and, therefore, the demurrer should be sustained and the proceeding dismissed.